**In re THE CATHOLIC BISHOP OF SPOKANE a/k/a The Catholic Diocese of Spokane, a Washington corporation sole, Debtor.**

**Committee of Tort Litigants, Plaintiff,**

**v.**

**The Catholic Diocese of Spokane, et al., Defendants.**

**Bankruptcy No. 04–08822–PCW11.**
**Adversary No. 05–80038–PCW.**

United States Bankruptcy Court, E.D. Washington.

Aug. 26, 2005.

James R. Murray, Gordon Murray Tilden LLP, Seattle, WA, for Debtor.

Gary W. Dyer, Spokane, WA, for trustee.

MEMORANDUM DECISION RE: 1) PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT; 2) VARIOUS MOTIONS TO DISMISS; AND 3) THE CATHOLIC DIOCESE OF SPOKANE'S CROSS–MOTION FOR SUMMARY JUDGMENT

PATRICIA C. WILLIAMS, Bankruptcy Judge.

## INTRODUCTION

This controversy arises under 11 U.S.C. § 541 which is the section of the Bank-

ruptcy Code which defines property of the bankruptcy estate. The Catholic Diocese of Spokane voluntarily commenced a Chapter 11 reorganization listing numerous parcels and items of real and personal property on its schedules as "property held for another" which property is in the possession of other members of the diocesan family. The debtor contends that, with certain exceptions, the individual parishes, schools, cemeteries and other members of the diocesan family own the real and personal property. It argues those assets do not constitute property of the estate and are not available for repayment of creditors. The bankruptcy reorganization was caused by numerous tort claims brought by victims of clergy sex abuse. Those claimants allege that the parishes, schools, cemeteries and other members of the diocesan family have no ownership interest in such property, all of which constitutes property of the estate.

## I.

### FACTS

On December 6, 2004, William S. Skylstad, as Bishop of the Catholic Church of the Spokane Diocese (hereinafter "Diocese") and as successor-in-interest to the incorporator of the "Catholic Bishop of Spokane, Washington," a corporation sole, placed the corporation sole in a Chapter 11 bankruptcy proceeding. (Voluntary Petition, Main Case Docket No. 1).

The Diocese has listed a number of the parishes as unsecured creditors in its Amended Schedule F based on funds previously deposited by each parish with the Diocesan Deposit and Loan Fund (hereinafter "D & L Fund"). Parish real property is listed as property held for another person at Item No. 14 of the Diocese Statement of Financial Affairs which includes the following description:

The Diocese has no equitable beneficial or proprietary interest in this property but, in some cases, holds mere legal title. In addition, certain of the property is subject to a restriction imposed by the donor or grantor.

(Schedules, Main Case Docket Nos. 1 and 130 and Statement of Financial Affairs, Main Case Docket Nos. 1 and 131.) There is no dispute that the value of the "property held by another" far exceeds the value of the undisputed property of the estate.

On February 2, 2005, the Tort Litigants' Committee (hereinafter "Committee") was appointed by the Office of the United States Trustee pursuant to 11 U.S.C. § 1102. (Appointment of Committee of Tort Litigants in a Chapter 11 Reorganization Case, Main Case Docket No. 206). The Committee represents tort claimants who had, pre-bankruptcy, initiated litigation against the debtor. On February 4, 2005, the Committee initiated this adversary proceeding seeking equitable relief in the form of declaratory orders against the debtor and various non-debtor members of the diocesan family such as parishes, schools, retreat centers, etc., each of which was named as a separate defendant. (Complaint, Adversary Docket No. 1). The separate legal nature of the various members of the diocesan family, particularly the parishes, is in dispute.

Another committee, the Tort Claimants' Committee (hereinafter "TCC"), was formed by the U.S. Trustee to represent the interests of claimants who had not filed suit pre-bankruptcy but had made known that they were also victims of sex abuse by clergy and hold claims. (Reconstitution of and Appointment of Committee of Tort Claimants in a Chapter 11 Reorganization Case, Main Case Docket No. 205). A representative has also been appointed to represent the interests of those victims, if any, who have not yet made their claims

known (hereinafter "FCR"). (Final Order Appointing a Legal Representative for Unknown Tort Claimants and Minors, Main Case Docket No. 550). Although neither the TCC or FCR are parties to this adversary proceeding, their interests are aligned with the plaintiff.

There are 155 named defendants in this adversary. Relying solely upon the caption, it appears roughly 98 of those defendants are parishes. An informal group of approximately 80 of the defendant parishes was formed and is referred to as the "Association of Parishes." It has been actively involved in this proceeding. The parishes are not debtors in any bankruptcy proceeding nor defendants in any state court lawsuits filed by Committee members. The Association of Parishes argues that the parishes have no legal relationship to the Committee. The Association of Parishes maintains that the Committee, or more accurately, the members of the Committee, have no claim to the property of any parish. (Complaint, Adversary Docket No. 1, and Answer, Adversary Docket No. 88).

The real property in dispute consists of churches, schools, cemeteries and other parcels. The personal property in dispute consists of bank accounts, investments, furniture, vehicles, etc. Both the real and personal property allegedly is "in fact under the Diocese's complete control and domination." The Complaint further alleges that the affairs of the Diocese and the other defendants which are members of the diocesan family are so entangled that no allocation of assets is possible, that collectively they are a single economic unit, and that substantive consolidation of the Diocese and the defendants would benefit all creditors. There are three requests for relief in the Complaint: (1) declaring that all disputed property constitutes property of the estate; (2) substantive consolidation;

and (3) ordering the debtor to amend its schedules to list the disputed property.

## II.

### *THE MOTIONS TO DISMISS*

The Association of Parishes filed a Motion to Dismiss. (Defendant Parishes' Motion to Dismiss, Adversary Docket No. 99). The Diocese joined in the Motion to Dismiss. (Joinder of Defendant The Catholic Diocese of Spokane, Adversary Docket No. 213). The Association of Parishes' Motion to Dismiss and joinder by the Diocese are supported by legal arguments as well as extrinsic evidence filed in support of the debtor's Cross–Motion for Summary Judgment and the Association of Parishes' opposition to the Committee's Motion for Partial Summary Judgment. Named non-parish defendants Catholic Charities, Inc., Morning Star Boys Ranch, Inc., Catholic Cemeteries, Inc. d/b/a Holy Cross Cemetery, St. Joseph Cemetery and Immaculate Heart Retreat House, Inc. joined in the Association of Parishes' Motion to Dismiss but filed no legal argument or extrinsic evidence (hereinafter "joining defendants"). (Joinder of Defendants Catholic Charities, Inc., et. al., Adversary Docket No. 102). Defendant Saint Philip's Villa, Inc. separately joined in the Association of Parishes' Motion to Dismiss and filed extrinsic evidence. (Defendant Saint Philip's Villa, Inc.'s Joinder in Motion to Dismiss, Adversary Docket No. 125). In connection with the Motion to Dismiss, the Association of Parishes, Diocese, joining defendants and Saint Philip's Villa, Inc. will be referred to as the "moving parties."

The moving parties cite to Fed. R. Bank. P. 7012(b), which incorporates Fed. R.Civ.P. 12(b)(1) and (6), as the basis of the motions. The Association of Parishes makes two specific arguments. Pursuant to Fed.R.Civ.P. 12(b)(6), they argue that the case should be dismissed because the

Committee does not have standing to seek derivative relief under 11 U.S.C. §§ 521 or 541 and thus they fail to state a claim upon which relief can be granted. The second basis for dismissal is that the Court lacks subject matter jurisdiction because there is no case or controversy between the parishes and the Committee. As a result, the case should be dismissed pursuant to Fed. R.Civ.P. 12(b)(1). These issues are addressed in more detail below.

### 1. *Failure to State a Claim Other than Lack of Standing.*

The 12(b)(6) motion, apart from the lack of standing argument, presents in a tangential way the argument that the parishes are not debtors in this proceeding, are not defendants in the state court actions brought by Committee members, and have no legal relationship with the Committee. The conclusion is that the Committee fails to state a claim upon which relief can be granted.

The briefs filed by the debtor and Association of Parishes in response to the plaintiff's Motion for Partial Summary Judgment and in support of debtor's Cross–Motion for Summary Judgment address the merits of the causes of actions in the Complaint, seek substantive relief and are based upon extensive extrinsic evidence rather than just the Complaint and answers. With the exception of the standing issue analyzed below, any analysis of 12(b)(6) as to the debtor's and the Association of Parishes' Motions to Dismiss would be redundant with the various motions seeking judgment as a matter of law and will not be separately addressed.

The joining defendants and Saint Philip's Villa, Inc. have, in addition to standing, raised independent issues relating to Fed. R.Civ.P. 12(b)(6). In essence, they argue that because they are separate legal entities under state law, they have no legal relationship with claimants in the bankruptcy proceeding and the plaintiff has failed to state a claim against them. Only Saint Philip's Villa, Inc. has provided any evidence in addition to the Complaint and Answer. That evidence consists of a copy of its Certificate of Incorporation, its Articles of Incorporation, certain correspondence between counsel, and a copy of the deed evidencing title to certain real estate is held in the name of Saint Philip's Villa, Inc. (Affidavit of John Munding, Adversary Docket No. 126).

The joining defendants and Saint Philip's Villa, Inc. seek dismissal at the pleading stage of the proceeding. In evaluating such motions, the Court is required to accept all facts alleged in the Complaint as true and construct them in the light most favorable to the plaintiff, the non-moving party. *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir.2003). Although motions to dismiss under Fed. R.Civ.P. 12(b)(6) may be supported by extrinsic evidence, with the exception of Saint Philip's Villa, Inc., no extrinsic evidence has been offered. Unless it appears beyond doubt that the plaintiff could not prove any set of facts in support of its claims which would entitle plaintiff to relief, the motions must be denied. *No. 84 Employer–Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 931 (9th Cir.2003), *cert. den.* 540 U.S. 966, 124 S.Ct. 433, 157 L.Ed.2d 311 (2003).

A separate corporate existence would not prevent the plaintiff from establishing facts sufficient to prevail on the alleged causes of action. Even though a non-debtor entity may have a legal existence separate from the debtor, that does not necessarily defeat substantive consolidation. *In re Bonham*, 229 F.3d 750, 763–765 (9th Cir.2000). Nor does the fact that title to real estate is held in the name of a

non-debtor preclude a determination that the debtor has an interest in that real estate. It cannot be concluded that the plaintiff could not introduce any evidence which would establish any of its causes of action. This aspect of the 12(b)(6) motion by the joining defendants is DENIED.

If this were strictly a 12(b)(6) motion without extrinsic evidence, Saint Philip's Villa, Inc. would not prevail. Fed.R.Civ.P. 12(b)(6) provides that if extrinsic evidence is submitted with a motion to dismiss, the motion is to be treated as a motion for summary judgment under Fed.R.Civ.P. 56. The analysis then becomes whether the extrinsic evidence changes the situation.

If viewed as a summary judgment motion, the result is the same. Fed. R. Bank. P. 7056 incorporates Fed.R.Civ.P. 56. Subpart (c) provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Summary judgment standards preclude granting of the motion if disputed material facts are present, and facts must be considered in the light most favorable to the non-moving party. *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005).

The extrinsic evidence, although uncontroverted, is not sufficient to defeat the claims in the Complaint. The extrinsic evidence reveals Saint Philip's Villa, Inc. had funds on deposit in the D & L Fund. Counsel for Saint Philip's Villa, Inc. characterized the deposit as one for safekeeping. (Affidavit of John Munding, Exhibit "E", Adversary Docket No. 126). The nature of the debtor's interest in that account and the understanding or agreement between the debtor and other defendants regarding the depositing and withdrawal of funds originating with the defendants is the subject of vigorous debate. That situation alone would defeat Saint Philip's Villa, Inc.'s motion if summary judgment standards were applied.

The 12(b)(6) motion by Saint Philip's Villa, Inc. on issues other than lack of standing is DENIED.

### 2. *Standing Argument.*

■ Lack of standing is a "subspecies of a Fed.R.Civ.P. 12(b)(6) request to dismiss for failure to state a claim." *In re Stoll*, 252 B.R. 492, 495 (9th Cir. BAP 2000). The most ardent argument advanced by the moving parties in support of the Motion to Dismiss is that this Court lacks jurisdiction as the plaintiff has no standing. To some extent, the analysis of standing under Fed.R.Civ.P. 12(b)(6) is intertwined with the analysis of whether a case or controversy exists under constitutional standards. The constitutional standards applicable to standing are addressed in a later portion of this opinion.

The moving parties contend that standing does not exist under the Bankruptcy Code. They rely on *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000) for their conclusion that the plaintiff Committee lacks standing to commence this adversary proceeding. In *Hartford*, an administrative claimant sought to recover its administrative claim from a secured creditor of the debtor under 11 U.S.C. § 506(c). That section states "The trustee may recover from property securing an allowed secured claim ...." The issue was whether the administrative claimant had standing to bring the claim or whether only the trustee had standing. Following the "plain meaning" trend of

statutory construction, the Supreme Court held that Congress generally "says what it means and means what it says" in statutory language. Absent an absurd result, the sole function of the Court is to enforce the statute's plain meaning. When a statute authorizes a specific action and designates a particular party to take that action, the common sense meaning is that only the named party is authorized to take the action. As 11 U.S.C. § 506(c) only designates a trustee as having authority, it was not necessary for Congress to state "only the trustee" as the exclusion of others is inferred.

Unfortunately for the moving parties, the Code provisions most directly applicable to this adversary are silent as to who has authority to raise issues under those Code provisions. Since this adversary proceeding is essentially a dispute regarding whether certain property constitutes property of the estate, 11 U.S.C. § 541 is of great importance. That statute, however, is merely definitional. It makes no provision as to the appropriate procedure by which such disputes are to be resolved nor does it authorize any particular party or parties to participate in such disputes. *Hartford* is not instructive in that it analyzed statutory language specifically designating a particular party to engage in particular activity.

This adversary is analogous to a "turnover proceeding." The Code provides that a custodian of property of an estate, in this situation the non-debtor defendants, shall "turnover" that property of the estate. 11 U.S.C. §§ 542 and 543. If a dispute arises regarding the turnover of the property of the estate, "notice and hearing" is required, but the statutes are silent as to who is authorized to request that notice and hearing.

The debtor, when filing its schedules, clearly articulated its position that it did not have an interest in the disputed property and that such property was owned by other members of the diocesan family. Ordinarily, there is no trustee in a Chapter 11 case. Who then has authority to challenge the debtor's designation? If only the debtor had authority to identify and raise disputes as to property of the estate, the Chapter 11 debtor's unilateral designation could not be challenged. Such a result is unwise. Some debtors have motives other than the repayment of creditors to the greatest extent possible. Some debtors have historical patterns of possession of real estate and personal property titled in the name of family members or affiliated corporations. Precluding creditors from disputing a Chapter 11 debtor's identification of property of the estate could easily result in rewarding dishonest or improperly motivated debtors and, at best, leave creditors and the court wondering at the conclusion of the reorganization whether in fact all property of the estate had been administered.

Perhaps due to these concerns, reading various Code sections leads to the conclusion that a creditors' committee has standing to raise such issues. Creditors' committees are specifically authorized to investigate the assets of debtors and any other matters relevant to the reorganization case. 11 U.S.C. § 1103(c)(2). They are empowered to perform "services as are in the interest of those represented." 11 U.S.C. § 1103(c)(5). They have the right to be heard "on any issue" in a reorganization case. 11 U.S.C. § 1109(b). The right to investigate the financial affairs of the debtor, including the assets of the estate, would have limited usefulness if a committee were not empowered to disagree with the debtor's characterization of its assets and bring that disagreement to the Bankruptcy Court for resolution.

Plaintiff has standing under the Bankruptcy Code. The 12(b)(6) motion to dismiss as it relates to standing is **DENIED** as to each of the moving parties.

### 3. *Lack of Subject Matter Jurisdiction.*

The Motions to Dismiss also raise jurisdictional issues under Fed.R.Civ.P. 12(b)(1). The moving defendants seek dismissal as (a) this is a non-core proceeding, and (b) the Court lacks subject matter jurisdiction because there is no case or controversy; and (c) because the constitutional requirements for standing have not been met.

### (a) *Core v. Non–Core*

■ Even if this were a non-core proceeding, that conclusion would not deprive the Bankruptcy Court of jurisdiction. Pursuant to 28 U.S.C. § 157(c)(1), non-core proceedings result in a submission to the District Court of the Bankruptcy Court's proposed findings of fact, conclusions of law and decree, but do not deprive the Bankruptcy Court of jurisdiction to hear the matter and enter proposed findings of fact, conclusions of law and decree. More importantly, this adversary proceeding is a core proceeding in which the Bankruptcy Court is empowered to fully hear and determine the merits and enter a final decree.

28 U.S.C. § 1334(b) states that the Bankruptcy Court[1] has exclusive jurisdiction of cases "arising under title 11" which would be the debtor's reorganization case. The Complaint requests that the financial affairs of the debtor be substantively consolidated with other members of the diocesan family. Such request certainly arises

under Title 11 as does the request to require the debtor to amend its schedules.

■ The statute further states in subsection (e) that Bankruptcy Courts "... shall have exclusive jurisdiction of all of the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate." 28 U.S.C. § 1334(e). The statute gives the Bankruptcy Court the exclusive jurisdiction to determine the parameters of the property of the estate. Identifying, administering and resolving competing claims to property of the estate is an essential function of a Bankruptcy Court. Even though the Bankruptcy Court must utilize state law in determining the nature and extent of the debtor's interest in property, the ultimate identification of property of the estate is exclusively within the jurisdiction of the Bankruptcy Court. *In re Golden Plan of California, Inc.*, 37 B.R. 167 (Bankr.E.D.Cal.1984); *In re Prudential Lines, Inc.*, 928 F.2d 565 (2nd Cir. 1991). This adversary proceeding requires interpretation and application of 11 U.S.C. § 541 and is thus a civil proceeding arising under Title 11. The Bankruptcy Court has exclusive jurisdiction to make such determinations.

Commencement of a bankruptcy proceeding creates a bankruptcy estate. The composition of that estate is governed by §§ 541, 551, 522, 1306, 1207 and other provisions of Title 11. Without a case under Title 11, no controversy or issue regarding property of the estate would exist. On occasion, such issues must be determined in the context of an adversary proceeding rather than in the underlying bankruptcy case. That does not render the issue or controversy a non-core proceeding.

---

1. The statute refers to the federal District Courts, but in this District, as is typical, the federal District Court has, by General Order, referred all such matters to the Bankruptcy Court.

28 U.S.C. § 157 also includes adversary proceedings, such as this, in its description of core proceedings. This adversary has been repeatedly likened to a "turnover action," as much of the disputed property is in the possession of the non-debtor defendants. Requests to "turnover" property of the estate are core proceedings under § 157(2)(E). Proceedings relating to the liquidation of estate assets are specifically identified as core proceedings under § 157(2)(O). It is difficult to conceive how a Bankruptcy Court could fulfill its duties regarding administration of the estate, which may include liquidation of assets, unless it had core jurisdiction to determine if particular assets constitute assets of the estate.

Indeed, the moving parties concede that if the debtor had articulated and alleged that the disputed assets were property of the bankruptcy estate, the other members of the diocesan family would have disputed that contention and that dispute would have constituted a core proceeding. The argument of the moving parties is essentially that because creditors, rather than the debtor, allege these assets constitute property of the estate, the controversy becomes a non-core proceeding. The identity of the person raising the issue does not affect the character of the issue or the conclusion that the issue arises under Title 11.

Application of the language of 28 U.S.C. §§ 157 and 1334 results in the conclusion that this is a core proceeding.

### (b) *Case or Controversy*

■ The moving defendants argue that the adversary complaint is in many respects a request for declaratory relief as it seeks a declaration that the property constitutes property of the bankruptcy estate. More frequently than other types of civil litigation, declaratory judgment actions may be found not to constitute a "case or controversy" under Article III of the federal Constitution. One component of constitutional requirements is that the particular plaintiff bringing the case or controversy to the court must have standing. The determination of standing is a two part analysis. Firstly, does the subject matter of the Complaint present a justiciable controversy. Secondly, does the person seeking the relief have a direct interest in the resolution of the controversy.

The analysis begins with the question of whether the Complaint sets forth a justiciable controversy. The defendants argue that, as there is no legal relationship between the plaintiff and the defendant non-debtors, there is no controversy which could affect the legal rights between them and the plaintiff. The adversary Complaint, the Answers filed by the defendants, and the debtor's Schedules clearly indicate that a controversy exists regarding the nature and extent of the various parties' interest in real and personal property. The Bankruptcy Court has exclusive jurisdiction over property of the estate. As the identification of property of the estate constitutes a core proceeding arising under Title 11 and is an issue necessarily addressed in every case arising under Title 11, there can be no doubt that this is the type of controversy which is to be addressed in a judicial proceeding. The question which then must be addressed is whether this particular plaintiff has a sufficient stake in the resolution of that justiciable controversy to seek relief from a judicial tribunal.

The Complaint alleges that the non-debtor defendants "... are not legal entities separate from or independent of the Diocese, but rather are merely operating divisions ..." and that they are "mere instrumentalities" of the debtor. The As-

sociation of Parishes and the debtor contend that the parishes, as unincorporated associations under Washington law, have separate independent legal existence with all attendant rights such as the right to sue and be sued. They concede that if they are correct in that contention, the members of the plaintiff and other similar claimants would hold tort claims which could be pursued against some of the parishes: to wit; those parishes associated with a particular priest who sexually abused a claimant. In other words, the adversary proceeding will determine whether it is possible for a legal relationship and a direct claim to exist between the members of the plaintiff and certain parishes. The Association of Parishes argues that no case or controversy exists as there is no legal relationship between members of the plaintiff and the parishes. The Association of Parishes simultaneously concedes that if the parishes prevail on their contention that they have a separate legal existence, a legal relationship and direct claims would exist. This is not persuasive.

The plaintiff is a creditors' committee appointed pursuant to 11 U.S.C. § 1102. It commenced this action on behalf of its members who had, pre-bankruptcy, commenced litigation against the debtor alleging claims of sex abuse by clergy members of the debtor. The members of the plaintiff Committee hold claims in the bankruptcy proceeding as defined in 11 U.S.C. § 101(5)(A). A claim is a "... right to payment, whether or not such right is reduced to judgment, liquidated, ... disputed, ... legal, equitable, ...."

The constitutional requirements for standing were enumerated in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992):

Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, (citations omitted) and (b) 'actual or imminent, not 'conjectural' or 'hypothetical,' (citations omitted). Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.' (Citations omitted). Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'

The Ninth Circuit stated it more succinctly in *Partington v. Gedan*, 961 F.2d 852, 862 (9th Cir.1992) as:

Article III of the Constitution requires that a would-be federal litigant allege some actual or threatened injury before a court can gain jurisdiction over the purported suit—the injury cannot exist in the abstract.

The injury which is threatened in this situation is pecuniary in nature. The members of the plaintiff have claims for money damages against the debtor which the debtor is unable to pay. In the foreseeable future, the debtor will be required to file a plan proposing to utilize its assets and future income to pay these claims. Absent this adversary proceeding, that plan would not include the disputed property as assets. Resolution of this adversary proceeding in favor of the plaintiff would result in the debtor having more assets with which to pay the claims held by the members of the plaintiff. They would receive more money from a plan which includes the disputed property than from a plan which does not. Absent the existence of this adversary proceeding, the members

of the plaintiff are faced with direct injury in the foreseeable future, i.e., less money available to pay their claims.

The plaintiff has demonstrated that a case or controversy exists and it has standing under the federal Constitution. The Fed.R.Civ.P. 12(b)(1) motions by moving parties are **DENIED**.

### III.

### *SUMMARY JUDGMENT/CROSS SUMMARY JUDGMENT MOTIONS*

The plaintiff filed its Motion for Partial Summary Judgment on April 7, 2005. That motion seeks a determination that 22 specifically identified parcels of real estate, title to which is held in the name of the debtor, are property of the estate (hereinafter "Disputed Real Property.") The debtor's Cross–Motion seeks a determination that "the property" of the various members of the diocesan family is not property of the estate. Presumptively, this means all real or personal property or equitable interest not just the Disputed Real Property. No other defendant filed a cross-motion for summary judgment. As the issues and arguments of all parties are intertwined, the Motion for Partial Summary Judgment and Cross–Motion will not be addressed separately.

**1. *Does the Doctrine of Judicial Estoppel Preclude the Diocese From Maintaining It Does Not Own The Property?***

**(a) *Requirements of Judicial Estoppel***

■ The purpose of the doctrine of judicial estoppel is to prevent a party from successfully maintaining a particular position in litigation and then assuming a contrary position in later litigation as it best suits the party to do so. It bars a party from making a factual assertion that is inconsistent with a factual assertion sworn

to in a previous proceeding, which proceeding resulted in a benefit to the party. *Rissetto v. Plumbers and Steamfitters Local 343*, 94 F.3d 597, 600–601 (9th Cir. 1996). The doctrine also precludes inconsistent legal positions. *Russell v. Rolfs*, 893 F.2d 1033, 1037–1039 (9th Cir.1990); *Yniguez v. State of Ariz.*, 939 F.2d 727, 738 (9th Cir.1991). To put the concept in the vernacular, a party "cannot argue out of both sides of its mouth."

■ Because legal disputes may take many forms, there is no precise definition of the doctrine nor checklist of factors to be met for its application. For the doctrine to apply, the party must have been successful in the prior litigation in persuading the court of the correctness of its position. The requirement of "success" includes negotiating a settlement with the opposing party. The *Rissetto* decision, *supra*, involved a person who successfully asserted that they were unable to work in a workers' compensation proceeding but later brought a claim against the employer alleging wrongful termination of employment due to age discrimination. A prerequisite to the wrongful termination claim was the ability to perform the work. The doctrine of judicial estoppel was applicable and the employee was precluded from maintaining the wrongful termination of employment claim due to the prior inconsistent position in the workers' compensation proceeding. The doctrine was applied even though the first proceeding was administrative in nature and even though it had been settled rather than adjudicated.

*New Hampshire v. Maine*, 532 U.S. 742, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) involved a dispute regarding the location of the state boundary which boundary had previously been the subject of a case before the Supreme Court. In the previous case, the same parties had agreed to the

interpretation of a particular historical document and the court, although there was evidence to the contrary, accepted the parties' agreement. In the later litigation, *New Hampshire* attempted to interpret the same historical document in a different manner. The Supreme Court held that the doctrine of judicial estoppel precluded *New Hampshire* from presenting its new and different interpretation. It had been successful, not in persuading the court of the correctness of a disputed legal argument or fact, but in persuading the court to accept the agreement it had reached with another party. That was sufficient for application of the doctrine.

■■■■■ The doctrine applies not only in succeeding litigation between the same parties, it is applicable to litigation when a party is faced with a different opponent in later litigation. *Lowery v. Stovall*, 92 F.3d 219, 223–226 (4th Cir.1996), *cert. denied*, 519 U.S. 1113, 117 S.Ct. 954, 136 L.Ed.2d 841 (1997). A litigant cannot posit a legal or factual position and convince a court of the correctness of that position and then in a later case posit the contrary legal position even though the later case involves a different opponent. The ultimate test is whether, by arguing opposing positions on the same factual or legal issue, the party may achieve conflicting results in the two proceedings. If so, then the party has necessarily "argued out of both sides of its mouth."

#### (b) *Is Judicial Estoppel Applicable Here?*

The earlier decisions relied on to support the contention that the debtor has previously successfully argued that the parishes do not own the real property are *Munns v. Martin*, 131 Wash.2d 192, 930 P.2d 318 (1997) and *Miller v. Catholic Bishop of Spokane*, 123 Wash.App. 1020,

2004 WL 2074328 (Wash.App. Div. 3, 2004).

■■■■ The latter is an unpublished opinion. Although unpublished opinions are not normally to be cited to a court as authority, when considering application of judicial estoppel, there is no requirement that the earlier decision be published. Indeed, the doctrine includes administrative proceedings such as in *Rissetto, supra.* The *Miller* case states that the plaintiff suffered injury due to a fall in a parish hall and "... sued the owner of the property, the Catholic Bishop of Spokane, for damages ...."

The *Munns* case arose when certain parishioners disagreed with the intention to demolish St. Patrick's School and build a pastoral center at St. Patrick's Parish, which parish is a named defendant in this adversary proceeding. When the debtor applied for the issuance of a demolition permit from the City of Walla Walla, the *Munns* group, composed of several parishioners in the parish plus one additional individual, sought delay of the issuance of the permit under the provisions of the City's Historic Preservation Code. Initially, the City delayed issuance but then indicated that it would issue the permit due to First Amendment concerns. The *Munns* group then sought a writ of mandamus requiring the City to impose the delay.

The Bishop then intervened in the mandamus action. The brief filed by the Bishop on appeal argued that this "is not a case where the affected property owner, the BISHOP OF SPOKANE, is challenging ...." the City's action. At page 3, the Bishop argued that the *Munns* group had no clearly founded legal rights in the matter.

The BISHOP OF SPOKANE, not THE MUNNS GROUP, owns the St. Patrick's school building in question. THE MUNNS GROUP have no proprietary

interest, and are not in any way owners of the building in question.

It argued that issuance could not be delayed as to do so would burden the free exercise of religion since demolition and construction of the pastoral center were "changes desired by controlling church authority ...." In discussing the economic burden at page 15, the Bishop argued

> While Petitioners contend otherwise, the BISHOP OF SPOKANE, as the property owner is the better judge of economic consequence of the project, and, more importantly, is the better judge of what is needed to further the Catholic mission of St. Patrick Parish and how best to further that mission from an economic standpoint.

In a footnote, the opinion recites that "The Bishop owns the property, part of St. Patrick's Roman Catholic Church, as a corporation sole." *Munns, supra,* at 196, 930 P.2d 318. The decision held that the delay in issuance of the permit did constitute a burden on the free exercise of religion of the debtor. Since no compelling state interest was present, the Bishop and the City were correct that the permit had to be issued.

■ The debtor does not directly argue that individual parishioners have an ownership interest in any of the Disputed Real Property, but supports that contention of the Association of Parishes. To the extent that the debtor so contends, that contention would be clearly inconsistent with the factual and legal position argued by the debtor in the *Munns* decision.[2] The Supreme Court relied upon the fact that the individual parishioners did not own the property in reaching its conclusion which was favorable to the debtor. The debtor cannot now maintain that individual parishioners have any ownership interest in the Disputed Real Property.

■ As to the debtor's contention in this adversary proceeding that the individual parishes own the Disputed Real Property, the *Munns* decision certainly implies that the debtor took an earlier inconsistent position. The debtor's brief filed with the Supreme Court stated that by referring to the Bishop it was referring to the corporation sole and to St. Patrick's "pastor and administrator" and council and building committee. It is noteworthy that the debtor did not refer to the parish as though it were a separate legal entity.

■ However, an inference or implication is not sufficient for application of the doctrine of judicial estoppel. It must be clear that the party made inconsistent representations of fact or law. As to the debtor's contention that the individual parishes own the Disputed Real Property, the doctrine of judicial estoppel is not applicable.

## 2. *Should the Court Apply Civil Law or Ecclesiastical Law to Identify Property of the Estate?*

■ "[A]ll legal or equitable interests of the debtor in property as of the commencement of the case" are property of the bankruptcy estate. 11 U.S.C. § 541(a)(1). Congress intended this definition to be interpreted broadly as it is vital to include all debtor's property in the estate. *U.S. v. Whiting Pools, Inc.,* 462 U.S. 198, 204–205, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983).

It is not disputed that the legal titleholder named in the deeds for the Disputed Real Property is "Catholic Bishop of Spo-

---

**2.** The basis for the contention is the fact parishioners provide funds to acquire and improve real property. Logically, the contention would apply to every parish.

kane." [3] (Affidavit of James Stang in Support of Motion for Summary Judgment, Adversary Docket No. 67, Exhibits "1" and "2"). Ordinarily this would end the inquiry as to the debtor's interest.

A bankruptcy debtor's estate does not include property in which the debtor holds "bare legal title" but no equitable interest. 11 U.S.C. § 541(d); *Dewsnup v. Timm,* 502 U.S. 410, 432, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992).

The debtor's position is that the applicable non-bankruptcy law to be applied in the analysis required by 11 U.S.C. § 541 is not state civil law but the internal law of the Roman Catholic Church, i.e., its canon law. Since canon law considers the disputed property as property of parishes or other members of the diocesan family, third parties who deal with the debtor are bound by that canon law and the debtor's interpretation of it. In other words, creditor's rights are determined not by ordinary civil law but by internal ecclesiastical doctrines. The proposition that the rights of creditors of religious organizations are to be determined in accordance with the ecclesiastical doctrine of the religious organization is perhaps not quite as astounding as it first appears.

The debtor and defendants first maintain that should this Court examine the canon law of the Roman Catholic Church, it would discover that under the canon law, the other members of the diocesan family are the equitable owners of the property with the debtor holding only bare legal title. Most of the members of the diocesan family and even the Diocese itself, are termed "juridic entities" under the canon law. The debtor cites canon law at great length for the proposition that each juridic entity owns its property and that the Bishop merely has supervisory duties and oversight of all the juridic entities in the Diocese. The claimants dispute this interpretation of canon law and cite, again at great length, contrary provisions of the canon law.

It is at this point that the debtor and defendants then maintain that the free exercise of religion clauses in both the federal and Washington State Constitutions preclude a court from examining canon law. Debtor states that not only is its interest in property determined by ecclesiastical law, which law provides ownership is always in the individual juridic entity, but that a court must accept debtor's interpretation of canon law without further inquiry. Furthermore, the highest church authority of the Roman Catholic Church on canon law has opined that to subject one juridic entity's property to recovery by creditors of another juridic person would be contrary to the separate nature and autonomy of juridic persons as provided by the canon law.[4] Consequently, the debtor and defendants argue that no civil court has authority to even examine the rights of creditors to church property as those rights are determined by internal church doctrine.

No civil court reported decision has been cited for the proposition that those who have monetary claims against a religious

---

3. Eighteen deeds reveal the record titleholder is the Catholic Bishop of Spokane, one deed refers to the Catholic Bishop of Spokane d/b/a Our Lady of Fatima, two deeds refer to Catholic Bishop of Nisqually, and one refers to Catholic Bishop of Spokane/Nisqually. Nisqually was the predecessor diocese which existed prior to statehood. The Disputed Real Property does not include the parcel held in the name of Saint Philip's Villa, Inc. referenced earlier.

4. This evidence is the subject of an objection as to admissibility. This statement is not considered as a fact by the Court, but included to articulate the debtor's argument.

organization and are engaged in a dispute with the religious organization regarding those claims are bound by the internal laws of that religious organization. Indeed, there is an oft repeated quote from *Watson v. Jones*, 80 U.S. 679 (13 Wall. 679), 20 L.Ed. 666 (1871), one of the oldest Supreme Court cases to address property disputes in the context of religious organizations, which is instructive.

> In this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it.

*Watson v. Jones*, 80 U.S. at 728–729.

The debtor and defendants would finish this quote with the following: "... and all who do business with or have monetary claims against the religious body are also bound to submit to its rules."

The debtor's position is that, in reaching its decision under 11 U.S.C. § 541, any application by this Court of state, civil or federal bankruptcy law rather than canon law is a governmental action violating Article I, Section 2, of the Washington State Constitution and the First Amendment of the United States Constitution. Application of civil law would interfere in the free exercise of religion according to the debtor.

A long line of Supreme Court cases have addressed resolution of property disputes among members of religious organizations. In every case, the controversy has not been between the religious organization and an unrelated third party but has been between the religious organization and certain members or prior members. The disputes have resulted from a schism in the religious organization. The questions have arisen in the context of doctrinal disputes, *[Watson v. Jones, supra]* congregations which have split into minority and majority groups with each claiming to be the "true" church *[Jones v. Wolf*, 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979)]* and in the context of the power to appoint a bishop or minister against the wishes of certain members of the church *[Serbian Eastern Orthodox Diocese for the United States of America and Canada v. Dionisije Milivojevich*, 429 U.S. 873, 97 S.Ct. 191, 50 L.Ed.2d 155 (1976)]*. Those cases have established certain principles applicable to intra-church disputes.

> ... the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes. It is obvious, however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property.

*Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 449, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969). That decision then applied the "neutral principles of law" approach in the consideration of property disputes involving competing factions with-

in the religious organization. It held that a court's jurisdiction to determine ownership of church property in such circumstances was "severely circumscribed" by the First Amendment. The later decision of *Serbian Eastern, supra,* allowed such disputes to be analyzed not only on a neutral principles of law approach but also on a "compulsory deference" approach. In the compulsory deference approach to disputes involving members of or groups within religious organizations, civil courts are bound to accept the decision of the organization's highest authority in matters of ecclesiastical policy including doctrine, organization, discipline or moral standards or rules. The focus is not on the title to the property but on who within the religious organization has control or authority. Once the source of the control is identified, the court is required to defer to that authority's determination of which of the competing factions of the religious organization represents the "true church" and is entitled to the property.

The Roman Catholic Church is a prototypical example of a hierarchical church. A hierarchical church is one in which various bodies in the church have similar faith and doctrines subject to a common governing ecclesiastical head. *Watson v. Jones, supra,* at 722–723; *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America,* 344 U.S. 94, 110, 73 S.Ct. 143, 97 L.Ed. 120 (1952). There is no dispute among the parties that the Roman Catholic Church is hierarchical.

Washington adopted the compulsory deference approach to disputes between members of religious organizations in *Wilkeson v. Rector, etc., of St. Luke's Parish of Tacoma,* 176 Wash. 377, 29 P.2d 748 (1934) and has applied that approach in later cases. *Southside Tabernacle v. Pentecostal Church of God, Pacific Northwest Dist., Inc.,* 32 Wash.App. 814, 650 P.2d 231 (1982). However, all those decisions involve intra-church disputes, that is to say, disputes as to ownership of property between different factions of a religious organization. In such disputes, as was noted in *Watson v. Jones, supra,* the parties to the dispute had historically voluntarily associated together under the umbrella of the religious organization with all its internal doctrines, practices and beliefs. By that association, they subjected themselves to the doctrines, matters of belief, organizational structure, rules and ecclesiastical authority of that organization. This controversy is inherently different. It involves the rights of creditors of the religious organization, not disputes among its members or component parts.

This is not an intra-church dispute. The Association of Parishes, the debtor and various members of the diocesan family all are in agreement. They all advocate for the proposition that canon law controls the issue of property of the estate. They all agree that the disputed property is not property of the estate as it is the parishes or other defendants which hold the equitable interest and that the debtor holds only bare legal title. This is a purely secular dispute between creditors and a bankruptcy debtor, albeit one which is a religious organization.

In situations which are not intra-church disputes but which involve governmental action which allegedly violate constitutional principles, the legal analysis differs. As a general proposition, the First Amendment does not prevent application of a law or body of law which is facially neutral and generally applied in the jurisdiction to a religious organization. This is true even though its application would have an incidental burden or effect on the exercise of religion. It is only if application of the law would have an undue or substantial burden on the exercise of

religion that further inquiry be made. If an undue or substantial burden does exist, a compelling governmental interest in the application must be present. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993); *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). The Religious Freedom Restoration Act, 42 U.S.C. § 2000bb, does not change that initial legal analysis. It merely repeats the proposition that laws which are neutral on their face may not, in their application, substantially burden the practice of religion. If a substantial burden exists, it must arise as a result of compelling governmental interest and be the least restrictive means of furthering that interest.

The present question is whether the application of 11 U.S.C. § 541 of the Bankruptcy Code, i.e., defining the debtor's interest in property in accordance with state civil law and federal bankruptcy law, results in a substantial burden on the debtor's free exercise of religion.[5]

Religious organizations do not exist on some ethereal plane far removed from society. As institutions, they engage in many secular activities. They hold title to real estate, they own vehicles, and their agents and employees drive those vehicles on public roads. Religious institutions contract for the purchase of goods and services and maintain bank accounts. They mortgage property and hold copyrights and purchase insurance policies. In short, religious institutions engage in many secular activities. Those secular activities often result in conflicts with others. A motor vehicle accident may give rise to a tort claim, a dispute may develop regarding the requirements of a purchase contract for goods or services, or the religious organization may default on a mortgage. Application of state law to the resolution of those disputes, which necessarily requires a determination of the rights of the parties, does not generally impose an impermissible burden on the practice of religion.

> The First Amendment does not provide churches with absolute immunity to engage in tortuous conduct. So long as liability is predicated on secular conduct and does not involve the interpretation of church doctrine or religious beliefs, it does not offend constitutional principles.

*C.J.C. v. Corporation of the Catholic Bishop of Yakima,* 138 Wash.2d 699, 728, 985 P.2d 262, 277 (1999).

One religious organization's use of another religious organization's materials protected by copyright law was prohibited in *Worldwide Church of God v. Philadelphia Church of God, Inc.,* 227 F.3d 1110 (9th Cir.2000). Even though a religious organization, the defendant was subject to enforcement of the copyright laws.

> Having to ask for permission, and presumably to pay for the right to use an owner's copyrighted work may be an inconvenience, and perhaps costly, but it cannot be assumed to be as a matter of law a substantial burden on the exercise of religion.

*Worldwide Church of God, supra,* at 1121.

▮ The existence of a substantial burden on the practice of religion becomes more difficult to demonstrate when the burden is alleged to exist in the context of

---

**5.** If application of a particular Code section would constitute a substantial burden on religion, the appropriate remedy would be dismissal of the bankruptcy case. The Code is an integrated statutory scheme. Bankruptcy debtors who voluntarily choose to participate in that statutory scheme, even those of a religious nature, should not be able to "pick and choose" among Code sections. Dismissal would alleviate any undue burden suffered by the debtor in the application of any particular Code section.

secular activities. Commencing a bankruptcy proceeding is certainly a secular activity. The fundamental purpose of a bankruptcy proceeding is to provide equitable and fair treatment for creditors and to provide the debtor a financial "fresh start." It is not a burden on a religious organization which voluntarily seeks the protection of the bankruptcy laws to require it to treat its creditors in the same manner as any other debtor. It is not a burden on a religious organization to assess its rights vis-a-vis creditors on the same basis as any other debtor.

The majority of claims in this bankruptcy proceeding are based upon personal injuries suffered as a result of sex abuse by members of the clergy. One is a personal injury claim arising from negligence, not sex abuse. The schedules list outstanding real estate taxes, priority wage claims and several general unsecured creditors who appear to be "ordinary course of business" creditors. Various executory contracts are listed, primarily leases of equipment and farm land. Fair and equitable treatment of all creditors requires application of civil law not only to determine their rights to recover from assets of the debtor, but to first define the interest of the debtor in those assets. That requirement does not impose an undue or substantial burden on the debtor's or the defendants' free exercise of religion.

This argument by the debtor and the defendants is in essence a request to impose internal ecclesiastical rules upon third parties who deal with the debtor in secular transactions. Application of commonly understood and commonly applied statutes and common law regulating property interests, rather than application of ecclesiastical law, does not interfere with the free exercise of religion. Application of § 541 to this debtor on the same basis as its application to all other bankruptcy debtors does not interfere with the free exercise of religion.

## 3. What is the Nature and Extent of Debtor's Interest in the Disputed Real Property Under the Laws of Washington?

The debtor is a corporation sole as provided in R.C.W. 24.12, etc. As such, it is a legal entity with powers to sue and be sued, hold and manage property, enter into binding contracts and generally take other actions and engage in other activities common to legal entities. R.C.W. 24.12.020. The corporation sole statute specifically authorizes the Bishop, who is deemed to be the body corporate, to hold property in trust. R.C.W. 24.12.040. If a bankruptcy debtor is acting as a trustee under a trust, the bankruptcy debtor has no equitable interest in the trust res. The trustee of a trust holds only "bare legal title" and the trust res would not be property of the bankruptcy estate. *Dewsnup v. Timm, supra; Olympic Federal Sav. & Loan Ass'n v. Regan*, 648 F.2d 1218, 1221 (9th Cir.1981). Under Washington law, trusts may arise by statute, by express writing, or be imposed by a judicial imposition of a constructive or resulting trust.

### (a) Does R.C.W. 24.12, etc., Create a Statutory Trust?

R.C.W. 24.12.010 authorizes a religious leader, in this situation the Bishop, to "in conformity with the constitution, canons, laws, regulation or discipline of such church or denomination, to become a corporation sole, ... and thereupon said bishop ... together with his successors in office or possession ... shall be deemed to be a body corporate ...." Unlike other not-for-profit corporations, a corporate sole does not have members or officers or a board of directors. A corporation sole is composed of a series of natural persons who, one after another, hold the office of

the religious leader of the particular religious organization. The statute provides for perpetual existence of the corporate body although the natural person holding the office has no perpetual existence.

A common sense reading of the statute is that, assuming that the internal rules of the religious organization so allow, a duly appointed Bishop or other religious leader may incorporate as a corporation sole under Washington law. Contrary to debtor's contentions, it does not state that by exercising the right to become a corporate sole, the internal rules of the religious organization become part of the laws of the State of Washington and thereafter govern the secular activities in which the corporate sole engages. "We need not leave our common sense at the door step when we interpret a statute ...." *Price Waterhouse v. Hopkins,* 490 U.S. 228, 241, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), superceded by statute as stated in *Stender v. Lucky Stores, Inc.,* 780 F.Supp. 1302 (N.D.Cal.1992). *See also, Demko v. U.S.,* 216 F.3d 1049, 1053 (Fed.Cir.2000).

The statutory scheme regarding corporate soles further provides in R.C.W. 24.12.020 that "[e]very corporate sole shall, for the purpose of the trust, have the power to contract ... to receive bequests and devises for its own use or upon trust ...." Chronologically, this is the first reference to "trust" within the statutory scheme and is followed by R.C.W. 24.12.030. That provision states in part:

> Articles of incorporation shall be filed in like manner as provided by law for corporations aggregate, and therein shall be set forth the facts authorizing such incorporation, and declare the manner in which any vacancy occurring in the incumbency of such bishop ... is required ... PROVIDED, All property held in such official capacity by such bishop ... shall be in trust for the use, purpose,

benefit and behoof of his religious denomination, society or church.

R.C.W. 24.12.030. It is this provision which, in the opinion of the debtor and defendants, statutorily establishes a trust for the benefit of the members of the diocesan family, i.e., the parishes, schools, retreat centers, etc. The statute does not so provide. The statute does not designate any particular beneficiary but merely identifies the nature or character of the possible beneficiaries. The beneficiary must be a religious organization. The statute does not establish a trust for any specific religious organization or for a congregation or a synod or parish or any component or subgroup or member of any religious organization. Religious organizations vary considerably in their structure and organization. The statute is neutral and allows the religious organization itself to determine the nature of any trust established. The statute allows the natural person, the Bishop, to hold property in trust for the religious organization, the corporation sole. This is the plain meaning of the statute.

The historical context giving rise to the enactment casts light on the purpose of its enactment. R.C.W. 24.12, etc., was adopted March 15, 1915. The legislative history does not reveal the purpose of the Washington legislature in adopting the statutory scheme. The historical context in which corporate sole statutes developed begins with the new nation of the United States of America in 1789. At that time, there were various devices employed to hold and convey ownership of church property.

Difficulties arose when trustees or lay persons held title to church property. Difficulties also arose when a priest or bishop held fee simple title to church property. There was a constant fear that church property held in a private name might

be claimed by a relative of the holder. Worse yet, the possibility existed that some unworthy claimant with a plausible story could make out a case for ownership. In one lawsuit, an unfrocked priest claimed to be heir to land that a deceased predecessor had purchased to build a church.

James B. O'Hara, *The Modern Corporation Sole*, 93 Dickinson Law Review 23, 29 (Fall 1988).

These problems continued to exist post-civil war. Following the death of the Roman Catholic Bishop in Michigan in 1868, the Bishop's relatives claimed as his heirs, the real property which he held in fee simple title for the church. Patrick Joseph Dignan, *A History of the Legal Incorporation of Catholic Church Property in the United States (1784–1932)*, 215 (P.J. Kennedy & Sons 1935) (1933). Even after the Civil War era, no clear solution to these difficulties had been developed. In 1878, the personal creditors of a Bishop who had been personally involved with a failed bank attempted to claim the real property in which the Bishop held in fee simple title for the church. *Id.* at 219–223.

In order to address these types of problems, many states authorized the formation of corporate soles. Washington's 1915 statute arose in this context and has not been substantively amended. History confirms that the general purpose of such statutes was to provide a device by which a religious organization could hold and acquire property as a separate perpetual legal entity. The natural person of the Bishop was to constitute the body corporate and the natural person holding that office was to hold the property in trust for the body corporate. Nothing in the language of the statute indicates it was intended to graft ecclesiastical doctrine onto the laws of the state or establish a trust for the benefit of any particular religious group. No statutory trust has been created.

**(b) *Has the Debtor Established an Express Trust?***

 R.C.W. 24.12 clearly authorizes the corporate sole to exercise civil legal rights, including the right to establish trusts[6]. An express trust arises when the grantor clearly intends to transfer property from the grantor to a trustee for the benefit of another. The grantor can designate itself as the trustee but the grantor must manifest an intention to create a trust relationship and make an effective transfer of the property. *Hoffman v. Tieton View Community Methodist Episcopal Church*, 33 Wash.2d 716, 207 P.2d 699 (1949); *Niemann v. Vaughn Community Church*, 118 Wash.App. 824, 77 P.3d 1208 (2003). The evidence of an express trust in this particular controversy consists of the Articles of Incorporation of the Catholic Bishop of Spokane, a corporation sole. The Articles, signed on July 3, 1915 by Augustine F. Schinner, Roman Catholic Bishop of the Diocese of Spokane, provide:

> Article III–This corporation is formed for the purpose of transacting business and holding property in trust for that certain religious denomination or society known as the Roman Catholic Church;
>
> . . .
>
> Article V–. . . all property held by it (the corporate sole) being in trust for the use, purpose and benefit and behoof of the Roman Catholic Church of the Dio-

---

6. The corporation sole Diocese has the authority to formulate, execute and implement written trust instruments conveying the Disputed Real Property to a trust established for the benefit of a particular parish or member of the diocesan family. There is no contention that it has done so.

cese of Spokane in the State of Washington."

The Articles could not express more clearly the intent to create a trust and, clearly, the current Bishop, in his official capacity, holds title to the trust res. The named beneficiary of the trust is not, however, any of the defendant members of the diocesan family. The named beneficiary is the Diocese itself. The Bishop, in his official capacity, holds the property in trust for the debtor Diocese. The words mean what they say, the beneficiary is "The Roman Catholic Church of the Diocese of Spokane." They do not mean what they don't say, that each individual parish or all parishes or any member of the diocesan family is the beneficiary.[7]

An express trust exists. The Bishop, as trustee, holds the property in trust for the Diocese, the legal entity which commenced the underlying bankruptcy proceeding.

### (c) *Has a Constructive or Resulting Trust Arisen?*

#### i. *Requirements for Imposition of Such Trusts*

■ The Association of Parishes, in its response to the plaintiff's Motion for Partial Summary Judgment, argues that as a matter of law, a constructive or resulting trust exists in all property for the benefit of the parishes or appropriate member of the diocesan family or, alternatively, for the benefit of the individual members of each parish. The property is in the possession of the parishes or other members of the diocesan family. A few parcels of Disputed Real Property were acquired from other Catholic organizations such as the Franciscans or Jesuits. Most property

has been acquired, improved, maintained, and insured with voluntary contributions or gifts or bequests made by parishioners and others who both intended and believed that the gifts were for the benefit of the parish or other diocesan family members. In considering whether an asset constitutes property of the estate, a Bankruptcy Court is first required to apply state law to determine whether a constructive or resulting trust exists. *In re B.I. Financial Services Group, Inc.,* 854 F.2d 351 (9th Cir.1988) and *Elliott v. Bumb,* 356 F.2d 749, 753 (1966).

■ A constructive trust is a remedy imposed by a court which arises in one of two scenarios. It is a remedy for fraud, abuse of confidence, gross misrepresentation or other improper or wrongful conduct which results in a person obtaining something to which he would otherwise not be entitled. In this situation, there has been no allegation of any wrongful conduct on the part of the Diocese relating to the parishes or other members of the diocesan family. The basis of the requested remedy is the second scenario in which the circumstances of the relationship or transaction demonstrates that allowing the titleholder to continue to hold the property would result in unjust enrichment. It is a purely equitable remedy. *Consulting Overseas Management, Ltd. v. Shtikel,* 105 Wash.App. 80, 18 P.3d 1144 (2001).

■ A resulting trust is also purely equitable. It is the judicial imposition of a duty upon the person found to act as trustee and that duty typically is the duty to convey title to the intended beneficiary. It is imposed when the facts and circumstances of the relationship or transaction indicate an intent of the parties to create a

---

**7.** Parol evidence may be utilized to establish an express trust if the beneficiary which is in possession of the property has performed under the trust. There is no authority for the use of parol evidence to change the terms of an express trust, in this case the identity of the beneficiary.

trust. If the facts and circumstances indicate that some other intention could be inferred, no resulting trust is imposed. *Thor v. McDearmid,* 63 Wash.App. 193, 205, 817 P.2d 1380 (1991); *Diel v. Beekman,* 7 Wash.App. 139, 148, 499 P.2d 37 (1972), overruled to the extent it is inconsistent with the doctrine of adverse possession in *Chaplin v. Sanders,* 100 Wash.2d 853, 676 P.2d 431 (1984).

Both types of non-express trusts are equitable in nature and the burden of proof is on the party seeking the relief. The entitlement to such relief must be shown by clear, cogent and convincing evidence. *In re Estate of Krappes,* 121 Wash.App. 653, 665, 91 P.3d 96 (2004); *Thor v. McDearmid, supra,* at 206, 817 P.2d 1380. The evidence must "unmistakably point" to the conclusion the equitable remedy should be imposed. *Diel v. Beekman, supra,* at 148, 499 P.2d 37.

The distinction between the two is subtle and, like beauty, is easily recognized in a particular situation but difficult to describe in the abstract. Reported decisions do not always clearly distinguish between the two doctrines. Simplistically, in constructive trust situations, the courts do not create an actual trust but effectuate relief as though a trust had been created at the time of the transaction. Absent allegations of wrongdoing, the basis for the corrective action is that it would be "unfair" or "inequitable" or just "not right" to allow the situation to continue. In a resulting trust situation, the court creates a trust as that was the parties' intention at the time of the transaction. The trust is created to convey the beneficial interest to the person who was intended to receive it. *See Restatement of Restitution* § 160, cmt. b at p. 642.

The essence of both constructive and resulting trust requires that the underlying facts and circumstances regarding the relationship and course of dealing between the parties must demonstrate that it would be inequitable to allow the titleholder to retain the beneficial interest in the property.

### ii. *Who are the Beneficiaries of the Constructive or Resulting Trust?*

The Association of Parishes, which has not filed a cross-motion for summary judgment, argues that the Disputed Real Property and, by implication, all other property in possession of any parish, is held in constructive or resulting trust for the benefit of either the parishes themselves or the individual parishioners associated with each parish.[8]

### *THE PARISHIONERS*

In support of the novel contention that those who put money in weekly church contribution envelopes acquire a beneficial interest in the assets of the church, the Association of Parishes relies on two propositions. Firstly, some of the gifts, donations, or contributions were specifically solicited and received for the purpose of acquiring, improving or maintaining a specific parcel of Disputed Real Property. Secondly, all contributions, donations or gifts were made based upon the donor's understanding or belief that the funds would be used exclusively for the parish.

As support for the first proposition, the parishes cite R.C.W. 24.44, the Uniform Management of Institutional Funds Act. That statute establishes certain standards for non-profit corporations receiving re-

---

8. Should the parishes not constitute separate legal entities capable of holding beneficial interests in property, the alternative argument is that the debtor itself holds the property in constructive trust for the individual parishioners.

stricted gifts. The funds may be placed into a pooled account, may be invested, and must be managed with "ordinary business care." The declarations by individual parishioners indicate that many parishes have, over the course of many years, solicited funds from individual parishioners and other persons, specifically to acquire or improve or maintain specific parcels of Disputed Real Property and have received donations for that purpose. Assuming that such constituted restricted gifts governed by this statute, the statute is irrelevant to this controversy. There is no evidence that any parish used any such restricted gifts contrary to the donor's intent. Even if that had occurred, the statute does not purport to provide the donor of a restrictive gift a beneficial or ownership interest in the asset acquired.

No legal authority has been cited in support of the second proposition that those who contribute money to a component part of a larger religious organization intending to benefit only that component part, acquire a beneficial interest in the assets of the religious organization or component part. No reported decision has been cited for the proposition that those who tithe or contribute to a church have a legally enforceable interest in the assets of the church. No law review article or legal treatise supports that contention. Undaunted, the Association of Parishes contends that the general precepts of constructive trust and resulting trust theory mandate that conclusion. The declarations of the parishioners repeatedly refer to "offerings," "donations," "tithes," and "gifts." *Webster's Ninth New Collegiate Dictionary (1985) Edition* defines gift as "something voluntarily transferred by one person to another without compensation". Donation is defined as "the action of making a gift esp. to a charity or public institution." A tithe is defined as "a tenth part of something paid as a voluntary contribu-

tion or as a tax esp. for the support of a religious establishment." The term offering has various definitions, the most relevant being "a contribution to the support of a church."

■ Voluntary gifts cannot result in a constructive or resulting trust. *Restatement (Second) of Trusts* § 25, cmt. a at p. 71, § 125, and *see also* § 37, cmt. a. To paraphrase Gertrud Stein, a gift is a gift is a gift and by any other name (donation, offering, tithe) would still not result in a legally enforceable interest in assets of the donee. No constructive or resulting trust exists for the benefit of individual parishioners.

### THE PARISHES

The Committee argues that unincorporated associations, such as the parishes, have no legal existence. One result of that conclusion is that they may not be beneficiaries of a trust. The Complaint alleges that the debtor controls and manages the other members of the diocesan family to such an extent that they lack the authority and independence of action necessary to constitute a separate legal entity. The Committee analogizes the parishes to operating divisions of a large corporation. Like operating divisions, they may exercise day-to-day decision-making authority and engage in transactions with third parties but routinely report to and are responsible to the officers and directors of the corporation who appoint those who manage the division, make policy decisions and must approve all transactions with significant economic consequences. The Association of Parishes denies this description of parish activities. Clearly, issues of fact exist.

For purposes of this opinion, it will be assumed that the parishes and other members of the diocesan family are separate

legal entities and capable of holding title to property and constituting beneficiaries of a trust. If constructive or resulting trusts exist, the beneficiaries would be the parishes or other members of the diocesan family.

■ The deeds to the property reflect fee simple title in the Diocese. If there is no limiting language, the deed is a fee simple title. *Ray v. King County,* 120 Wash.App. 564, 577, 86 P.3d 183 (2004). The Washington Supreme Court has noted that the settled rule in Washington is that a deed which conveys the land to the grantee operates as a grant of fee even though it may have language which attempts to designate or restrict the use of the property. *King County v. Hanson Inv. Co.,* 34 Wash.2d 112, 119, 208 P.2d 113 (1949). The Diocese and Association of Parishes have submitted declarations that it was the intention of the Diocese and the parishioners who gave the monetary gifts relating to the property that the Disputed Real Property would be for the benefit of the parishes. They argue that since the titleholder and the alleged beneficiary of the trust agree that the parishes should hold the beneficial interest, the inquiry ends. This ignores the fact that the deeds do not reflect this supposed intention. Under this theory, debtors would be free to hold fee simple title to property but submit a declaration from a family member or related corporation indicating that the family member or related corporation was to have held the beneficial interest in the property thus removing such property from the reach of creditors without further inquiry. Such a result would require the Court to ignore the deed and totally rely upon self-serving statement of the debtor and theoretical beneficiary.

Reliance on the declarations of the priests and parishioners on this point is not sound. At best, these declarations say that contributions or gifts were intended for the benefit of the individual parish. There are no allegations that the parishes did not benefit or that the gifts and contributions were misdirected or misallocated. The property was acquired and the parishes occupied the buildings and had use of the same. The purpose of a gift or donation to any church for property and facilities is to create a place for worship, learning and gathering as a community. The identity of the holder of title or beneficial interest is not a factor. If a Boy Scout camp or a church camp happen to be located on forest land leased from the federal government, those with an interest would still contribute to the physical development of the camp. Those contributions would have no effect on the legal title. There is no evidence to support the creation of a constructive or resulting trust with regard to the Disputed Real Property.

■ As to the personal property, disputed issues of fact exist. Examples of the issues surrounding the handling of money can be found in the Interim Agreed Order on Motion of Debtor for Entry of An Order (A) Authorizing Continued Use of Debtor's Cash Management System; ... (Main Case Docket No. 270). The Order refers to the D & L Fund which, from time to time, receives deposits from parishes which deposits are held in the parishes' name. As the name implies, the D & L Fund occasionally makes loans to parishes. There are pooled accounts containing parish and other diocesan family member funds which are invested by the debtor which manages and directs the investment activity. Certainly, the Diocese has possession of the funds. Numerous disputed facts exist regarding the interest of the Diocese in these funds under state law. This decision does not attempt to resolve the nature and extent of the debtor's interest in the various cash and invest-

ment accounts nor questions regarding other personal property.

### 4. *Effect of Federal Bankruptcy Law on Alleged Constructive or Resulting Trusts.*

■ Assuming the parishes and other members of the diocesan family could demonstrate grounds to impose a constructive or resulting trust under state law, that would not end the inquiry as to whether such property constituted property of the bankruptcy estate. The ultimate identification of property of the estate is dependent upon application of federal bankruptcy law. *In re Cogar*, 210 B.R. 803, 809 (9th Cir. BAP 1997).

■ Constructive trust is a remedy and does not exist until imposed by a court. Any such prospective trust is inchoate.

> While we agree that any constructive trust that is given effect must be a creature of (state) law, we cannot accept the proposition that the bankruptcy estate is automatically deprived of any funds that state law might find subject to a constructive trust.... A constructive trust is not the same kind of interest in property as a joint tenancy or a remainder. It is a remedy, flexibly fashioned in equity to provide relief where a balancing of interests in the context of a particular case seems to call for it.... Moreover, in the case presented here it is an inchoate remedy; we are not dealing with property that a state court decree has in the past placed under a constructive trust.

*In re North American Coin & Currency, Ltd.,* 767 F.2d 1573, 1575, (9th Cir.1985), *cert. denied, Daniel Torres v. Eastlick,* 475 U.S. 1083, 106 S.Ct. 1462, 89 L.Ed.2d 719 (1986).

If the parishes and other defendants could demonstrate unjust enrichment or other cause for the imposition of a constructive trust under state law, that remedy is no longer available once a bankruptcy has been commenced. *In re Tleel,* 876 F.2d 769 (9th Cir.1989).

> Because it is a *remedy,* a constructive trust cannot affect rights in the res until it is imposed. A constructive trust imposed by state law pre-petition would therefore exclude the res from the debtor estate. If the remedy remains inchoate post-petition, however, it is subordinate to the trustee's strong arm power.

*In re Markair, Inc.,* 172 B.R. 638, 642 (9th Cir. BAP 1994).

■ As to resulting trusts under state law, no such trusts exist until created by judicial act. The rationale of *Markair, supra,* would also apply to such inchoate trusts. The Bankruptcy Court has jurisdiction to create a resulting trust as it is a court of equity and such trusts are creatures of equity. However, a Bankruptcy Court must balance not just the equities between the entity which holds legal title to the property against the entity which holds the beneficial interest, but those interests against the equities in favor of the creditors. A resulting trust cannot be used as a weapon to defeat the claims of creditors. *In re Foam Systems Co.,* 92 B.R. 406 (9th Cir. BAP 1988). In this situation, the debtor and entities affiliated with the debtor have agreed between themselves that a resulting trust renders the Disputed Real Property immune from the claims of debtor's creditors. Such contention, however, fails to consider the equities in favor of those holding claims against the debtor.

■ Imposition of a resulting trust is also inconsistent with 11 U.S.C. § 544. A Chapter 11 debtor has the rights of a trustee under that section. *In re Kim,* 161

B.R. 831 (9th Cir. BAP 1993); *In re Probasco*, 839 F.2d 1352 (9th Cir.1988). The deeds to the Disputed Real Property reflect fee simple title in the debtor. They provide no notice of any prospective or existing trust. A creditor doing business with the debtor and relying upon its general creditworthiness would have no reason to believe nor any notice that the property was not an asset of the debtor. A bona fide purchaser for value would obtain fee simple title without regard to the existence of any agreement between the debtors and members of the diocesan family that the property was to be held in trust. The debtor has the rights of a bona fide purchaser under § 544(a)(3) and could set aside any beneficial interests claimed by the other members of the diocesan family. Indeed, the power to exercise the rights of a bona fide purchaser under § 544(a)(3) and void those interests could be granted to the plaintiff's Committee. *Official Committee of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3rd Cir.2003).

*In re Tleel, supra,* in discussing the effect of § 544(a)(3) upon constructive trusts concluded that a trustee exercising the powers granted in that section would have priority over any interest of the purported beneficiary of such a trust. The same rationale is applicable to resulting trusts.

No constructive or resulting trust exists.

## IV.

### *CONCLUSION*

There are disputed material facts regarding the nature of the parishes and other members of the diocesan family. For purposes of this decision, it has been assumed that the debtor and other defendants are correct in their contention that the parishes and other members of the diocesan family have the legal capacity to hold the beneficial interest under a trust. There are also disputed material facts regarding the nature and extent of the debtor's interest under state law in certain cash and investment accounts as well as other personal property. This decision does not address that issue.

The various Motions to Dismiss for lack of standing and lack of jurisdiction are **DENIED**. The plaintiff's Motion for Partial Summary Judgment is **GRANTED** and the debtor's Cross–Motion for Summary Judgment is **DENIED**. It is not a violation of the First Amendment to apply federal bankruptcy law to identify and define property of the bankruptcy estate even though the Chapter 11 debtor is a religious organization. Nor is it a violation of the First Amendment to determine the nature and extent of the debtor's interest in property by application of state law rather than internal church doctrine. As authorized by R.C.W. 24.12, et seq., an express trust was created whereby the Bishop, a natural person, holds legal title to the Disputed Real Property in trust for the benefit of the debtor Diocese which holds the beneficial interest. The Disputed Real Property constitutes property of the estate.