■ COMMITTEE TO SAVE ST. BRIGID'S INC. et al., Appellants, v EDWARD CARDINAL EGAN et al., Respondents. [846 NYS2d 30]—

Judgment, Supreme Court, New York County (Barbara R. Kapnick, J.), entered March 1, 2007, granting dismissal of the complaint, affirmed, without costs. Appeal from order, same court and Justice, entered on or about February 13, 2007, which denied plaintiffs' motion for a preliminary injunction and granted the motion by defendants Cardinal Egan and Church of St. Brigid to dismiss, dismissed, without costs as subsumed in the appeal from the judgment.

The issue in this case is not, as the dissent posits, "whether the parishioners of an incorporated Roman Catholic church in lower Manhattan have any rights in a property dispute with Cardinal Egan," but whether, or to what extent the courts should intervene in the internal governance of a hierarchical church.

Plaintiffs' claims of breach of fiduciary duty and the impropriety of defendants demolishing the church without plaintiffs' authorization were considered and rejected in a prior action (30 AD3d 356 [2006]). In affirming the court's decision that the disposition of the church property and funds at issue were matters well within the ecclesiastical purview of defendants, we specifically adhered to the long-standing and sensible prohibition against court involvement in the governance and administration of a hierarchical church, citing *Serbian Eastern Orthodox Diocese for United States and Canada v Milivojevich* (426 US 696 [1976]). It is beyond cavil that the Roman Catholic Church is such a hierarchical church. Although plaintiffs attempt to recast this action as claims allegedly arising after the first action was decided, it is clear that the present claims derive from the same circumstances as those dismissed in the first action, i.e., defendants' decision to demolish the church, and therefore must also be dismissed (*North Am. Van Lines, Inc. v American Intl. Cos.*, 38 AD3d 450 [2007]). Nor do Religious Corporations Law §§ 5, 90, 91 and 92 require a different result, as those sections clearly vest approval authority for all actions taken by the trustees of an incorporated church in "the archbishop or bishop of the diocese to which such church belongs" (*see specifically* §§ 5, 91; *see also Pappas v Greek Orthodox Archdiocese of N. & S. Am.*, 30 AD3d 286 [2006], *lv denied* 8 NY3d 803 [2007], *cert denied* 552 US —, 128 S Ct 86 [2007]).

Plaintiff's remaining claim, that the demolition permit was issued based on a false statement that could not later be ratified (*cf. Downey v Lackawanna City School Dist.*, 51 AD2d 177 [1976]), is without factual or legal support. Concur—Sullivan, J.P., Buckley, Gonzalez and Sweeny, JJ.

Kavanagh, J., dissents in a memorandum as follows: For the following reasons, it is my view that plaintiffs' motion for a preliminary injunction should be granted and their complaint reinstated.

This appeal presents the question of whether the parishioners of an incorporated Roman Catholic church in lower Manhattan have any rights in a property dispute with Cardinal Egan, the Archbishop of New York. In this case, the alleged motive of the Cardinal and the Archdiocese for seeking to demolish St. Brigid, one of the oldest Roman Catholic churches in the City, is to develop residential apartments on the site whereby the benefits from the property would inure to the benefit of the Archdiocese even though it is undisputed that the Archdiocese does not own the property.

The church, in Manhattan's East Village, was built by Irish

shipwrights in 1848, and funded by immigrants fleeing the famines in Ireland in that century. The church and the real property on which it sits was deeded to the Corporation of the Church of St. Brigid (formerly St. Bridget) by Cardinal John McCloskey, Archbishop of New York in 1885, 16 years after the incorporation of the church.

In June 2001, Cardinal Egan ordered that the church be closed on the grounds that serious structural problems had made it unsafe. In September 2003, the Archdiocese filed an application with the New York City Department of Buildings (DOB) to convert the church into residential apartments. In August 2004, Bishop Robert Brucato, the Vicar General for the Archdiocese, announced that the parish would be closed within two weeks, and the last Mass was held there on September 12, 2004. Since then, the altar, tabernacle, statues, organ and pews have been removed from the church. An application for a demolition permit was filed by Kevin Shaughnessy, a consultant working on behalf of defendants, and was granted.

On or about July 11, 2005, plaintiff Committee and several parishioners commenced an action seeking to enjoin the demolition and reopen the building as a church. Cardinal Egan crossmoved to dismiss the complaint on the grounds that the court was without jurisdiction because, inter alia, plaintiffs' claims were barred by the Establishment and Free Exercise Clauses of the First Amendment, plaintiffs lacked standing, and the claims were barred by the statute of frauds.

The court found that plaintiffs were seeking an order directing Cardinal Egan to use funds for the restoration and reopening of the Church, which was an impermissible intrusion into his ecclesiastical authority. The court noted, however, defendants' acknowledgment on the record that St. Brigid did not yet have a properly constituted board of trustees, and that no demolition could take place absent a duly-made decision by such a board. It therefore deemed plaintiffs' cause of action unripe for determination, granted defendants' cross motion and dismissed the complaint (*Committee to Save St. Brigid v Egan*, 2006 NY Slip Op 30218[U]). This Court affirmed that ruling in June 2006 (30 AD3d 356 [2006]).

Subsequently, the Board of Trustees for St. Brigid was convened, pursuant to Religious Corporations Law § 91, consisting of Cardinal Egan, Bishop Brucato, Monsignor Thomas Gilleece (administrator of St. Brigid's parish), and two laypersons, Carmine Chaparro and Ines Akbar. The Board met on July 18, 2006, without any notice to plaintiffs, and passed a resolution directing the demolition of the building and ratifying

the action taken by Kevin Shaughnessy in obtaining a demolition permit.

On or about July 26, 2006, plaintiffs commenced the current action by order to show cause staying the demolition permits and enjoining defendants from proceeding with demolition. Plaintiffs obtained a temporary restraining order prohibiting defendants from demolishing the building pending the outcome of their appeal to the Board of Standards and Appeals (BSA) for a full review of the granting of the permits. When the BSA ruled that the matter was outside its jurisdiction, defendants moved by order to show cause in August for an order vacating the temporary restraining order and dismissing the complaint.

On February 13, 2007, the court dismissed the action in its entirety, ruling, inter alia, that parishioners are not members of the corporation of a hierarchical church like the Roman Catholic Church, and that no such rights are conferred on parishioners by St. Brigid's certificate of incorporation or bylaws. It therefore determined that defendants were not barred by Religious Corporations Law § 5 from authorizing the demolition of the building.

This inquiry, then, requires an analysis of Religious Corporations Law § 5, which outlines the general powers and duties of trustees of religious corporations, and an examination of sections 90, 91 and 92 which specifically apply to the Roman Catholic Church. Case law is sparse, but the plain language of the statute indicates that the court erred in dismissing this complaint in its entirety.

As a threshold matter, defendants' argument that plaintiffs' claims are barred by res judicata on the grounds that this Court has already ruled that the closure of St. Brigid falls within the realm of the Cardinal's ecclesiastical authority is without merit. The issue of enjoining demolition of this church was not before the lower court in the first action, where the court determined that the trustees had not voted on the matter of demolition; therefore, demolition was not a justiciable issue. Moreover, this Court, in affirming, held only that "the disposition of the church property and funds at issue were matters within defendant's ecclesiastical authority and, accordingly, that *the relief sought by plaintiffs, i.e., an order mandating that the funds in question be used to restore the subject property for use as a church, would impermissibly involve the court* in the governance and administration of a hierarchical church" (30 AD3d 356, 356 [2006] [emphasis added]).

Plaintiffs now concede that they have no rights in deciding whether to reopen or close a church or parish. However, they

seek to enjoin demolition on the grounds, inter alia, that defendants have violated Religious Corporations Law § 5, which in relevant part states: "The trustees of every religious corporation shall have the custody and control of all the temporalities and property, real and personal, belonging to the corporation and of the revenues therefrom, and shall administer the same in accordance with the discipline, rules and usages of the corporation and of the ecclesiastical governing body . . . *for the support and maintenance of the corporation*, or, providing the members of the corporation at a meeting thereof shall so authorize, of some religious, charitable, benevolent or educational object conducted by said corporation . . . and they shall not use such property or revenues for any other purpose" (emphasis added).

Plaintiffs argue that demolishing the church and using the site for residential development will not be administering the real property for the "support and maintenance" of the corporation, since an "incorporated church" is a religious corporation "created to enable its members to meet for divine worship or other religious observances" (Religious Corporations Law § 2).

Plaintiffs further assert that to allow defendants to proceed with the demolition and use the property for "other purposes" without the consent of the church members would undermine the very purpose for which the Religious Corporations Law was enacted, namely, to prevent the diversion of property from its true beneficiaries—the congregation (*see Morris v Scribner*, 69 NY2d 418, 423 [1987]).

In support of their assertion, plaintiffs point to the record, specifically to plans submitted by the Archdiocese to DOB in September 2003 regarding the conversion of the church into an apartment building. Additionally, the record includes an Archdiocese press release stating its intention to use the property for "other Archdiocesan purposes and ministry." In such case, plaintiffs claim, Religious Corporations Law § 5 demands that the members of the corporation must authorize such "other" purpose.

Defendants argue, however, that the parishioners, represented herein by plaintiffs, are not voting members of the corporation. They contend that religious corporations are "Type B" corporations (*see* N-PCL 201 [b]), set up "to benefit a broad class of society" rather than a group of members (citing Joint Legis Mem No. 1 accompanying enactment of the statute in 1969, reprinted in 1969 McKinney's Session Laws of NY, at 2466, 2478). As such, defendants maintain, the lower court correctly ruled that pursuant to Not-For-Profit Corporation Law § 601 (a), a Type B

corporation "may have no members, in which case any such provision for classes of members or for no members shall be set forth in the certificate of incorporation or the by-laws." Defendants further assert that the membership of a religious association is not like membership of a corporation, and, in any event, Religious Corporations Law §§ 91 and 92 recognize a Roman Catholic bishop's authority and supremacy in the right to dispose of a church corporation's property, including real property, even without the consent of its board of trustees.

Finally, defendants assert that the hierarchical nature of the Roman Catholic Church is statutorily recognized in Religious Corporations Law § 91. Specifically, they argue, the statute recognizes that no act or proceeding of the trustees of any such incorporated church shall be valid without the sanction of the archbishop or bishop of the diocese to which the church belongs.

Indeed, the fact that the archbishop or bishop of a diocese, along with the diocesan vicar-general or administrator, are de jure members of every board of trustees of every incorporated church in the diocese (see Religious Corporations Law § 91) appears to summarily foreclose the members of the congregation from playing any possible role in the church corporation. Such an assumption would, however, necessarily render meaningless the Religious Corporations Law § 5 provision that requires trustees of every incorporated church to administer the real and personal property of the incorporated church for the "support and maintenance of the corporation" or to get authorization from the members if administered for any other purpose. As this Court noted in Pappas v Greek Orthodox Archdiocese of N. & S. Am. (30 AD3d 286 [2006], lv denied 8 NY3d 803 [2007], cert denied 552 US —, 128 S Ct 86 [2007]), parishioners had to be considered members for the purpose of standing to challenge the actions of the church body because to hold otherwise would "as a practical matter" insulate the defendants' actions from judicial review (30 AD3d at 287).

Nevertheless, given the Religious Corporations Law sections (90, 91, 92) that heavily underscore the hierarchical nature of the Roman Catholic Church, the question arises as to who or what precisely comprises the corporation of St. Brigid R.C. Church, and as a corollary, the rights that plaintiffs, parishioners and/or the congregation may have in that corporation.

It is useful to put the issue into historical context.* The first general law of this state for the incorporation of churches was

---

* St. Brigid was incorporated pursuant to "an Act to provide for the Incorporation of Religious Societies passed . . . [in 1813], and an act amendatory thereof passed . . . [in 1863]."

chapter 18 of the Laws of 1784, applicable to all denominations (*see* Historical and Statutory Notes, McKinney's Cons Laws of NY, Book 50, Religious Corporations Law § 1). The statute was revised as to religious societies in 1813, and then specifically with regard to the incorporation of Roman Catholic churches in 1863.

The Court of Appeals has interpreted this legislative history with specific reference to the respective roles of the trustees and the congregation. In *Robertson v Bullions* (11 NY 243, 249-250 [1854]), the Court held that "the views which appear to have been generally entertained by both courts and people upon this subject are correct; that the societies are themselves incorporated; that their members are the corporators, and the trustees the managing officers of the corporation."

In *People's Bank v St. Anthony's R.C. Church* (109 NY 512, 520-521 [1888]), the Court held that while the act of 1863 "changes as to Roman Catholic churches the mode of the selection of trustees and vests in them the exclusive power of management and control, [it] does not constitute the trustees [as] the corporation in place of the congregation." The 1863 amendment prescribed that a Roman Catholic church or congregation "shall be a body corporate . . . and the said persons so signing the [certificate] shall be the trustees thereof" (L 1863, ch 45, § 1).

Most significant perhaps, is the ruling in a case involving a bishop of an *unincorporated* Roman Catholic church where the title to the church real estate was held by the bishop "in his own name, as trustee for its benefit" (*Baxter v McDonnell*, 155 NY 83, 91 [1898]). "The purpose of this arrangement is to *exclude the laity from that power of interference which they would have were the title vested in a corporation*" (*id.* at 94 [emphasis added]).

These early decisions of the Court of Appeals "treated incorporated religious societies as civil rather than ecclesiastical bodies" (*Conklin v State of New York*, 284 App Div 193, 197 [1954]). The Legislature subsequently provided that trustees of incorporated religious societies "shall administer the temporalities thereof . . . for the benefit of such corporations . . . and it shall not be lawful for the trustees to divert such estate, property, or revenues to any other purpose except toward the support and maintenance of any religious, benevolent or other institution connected with such church, congregation or religious society" (L 1875, ch 79, § 4). The essence of that enactment is now embodied in Religious Corporations Law §§ 5 and 16.

Viewed in this context, plaintiffs' argument is persuasive that even in a hierarchical organization such as the Roman Catholic Church, where individual parishioners may not have voting rights per se or membership certificates, Religious Corporations Law § 5 nonetheless "contemplates and takes into account the purposes and needs of the congregation which creates, perpetuates and is represented by the corporation or legal entity" (*Trustees of Presbytery of N.Y. v Westminister Presbyt. Church of W. Twenty-Third St.*, 222 NY 305, 317 [1918] [interpreting the predecessor to Religious Corporations Law § 5]).

Moreover, while the bylaws of the St. Brigid corporation do not provide for a membership class, neither do they specifically state that the members of the congregation are not members of the church corporation. To the contrary, a reference to the congregation's role in the corporation's business appears in section VI of the bylaws: "a synopsis of [annual receipts and disbursements of the church], together with a statement of the assets and liabilities of the church, shall be prepared . . . for the information of the congregation, or otherwise laid before them."

As plaintiffs contend, the plain language of Religious Corporations Law § 5 does not exempt hierarchical churches. Indeed, its opening sentence makes it applicable to the trustees of "every" religious corporation. Nor is there any case law that exempts trustees of religious corporations from the duties imposed on all fiduciaries.

Furthermore, the provision in section 5 that specifically refers to the Roman Catholic Church and requires trustees to obtain the consent of the Archbishop to transfer church property does not conflict, in any way, with the separate requirement that authorization by the members of the religious corporation is necessary prior to administering church property for purposes other than support and maintenance of the corporation.

Moreover, neither Religious Corporations Law § 91 nor section 92, which are specifically pertinent to incorporated Roman Catholic churches, exempts the Archdiocese from this requirement. Section 91 concerns the hierarchical government of incorporated Roman Catholic churches. Section 92 concerns the limited situation where a Roman Catholic parish has been divided and the title to real property belonging to the original church corporation is to be transferred in whole or in part to property belonging to the second corporation. In such cases, this section gives the Roman Catholic bishop the unilateral right to transfer title to the new or second religious corporation: "If a valuable consideration is paid for the transfer the same

shall be received by the said Roman Catholic bishop . . . and distributed between the said original Roman Catholic church corporation and the new or second Roman Catholic church corporation in such proportions as in the discretion of the said bishop . . . may seem proper." While this section, as defendants argue, confers ultimate authority and power on the bishop to dispose of parish properties, a plain reading establishes it as a limited power, and the title to the property, or consideration for same, must be apportioned *between church corporations*. Nowhere does it state that a bishop or archbishop has the power to divert those assets to the archdiocese.

In any event, this case does not involve a division of parishes or transfer of title from one church corporation to another. Defendants appear to acknowledge as much in their brief: "The property remains with St. Brigid. (Indeed, it cannot be transferred without a court order)." They then proceed to argue that their intention to demolish a building the Trustees have deemed unsafe falls under the category of managing the property for the support and maintenance of the corporation, in accordance with Religious Corporations Law § 5, and that in effect, they have not decided to use the property for any "other" purpose. Plaintiffs assert that defendants' claim of a hazardous condition and their statement that they have no other plans for the site are suspect, pointing to evidence in the record of the submitted plans for the conversion of the site to apartment buildings and a report of their engineering expert that contradicts defendants' claims about the church's condition and the cost of repairs. Therefore, the dispute essentially revolves around the issue of whether St. Brigid Church needs to be demolished for safety reasons, or whether it can be restored for less than what diocesan experts claim.

Consequently, the court erred in holding that the decision to demolish the church is a matter of ecclesiastical polity. Determination about the safety of the church structure does not concern internal governance or religious dogma, but rather can be made by applying neutral principles of law, and thus judicial review is permissible (*see Jones v Wolf*, 443 US 595 [1979]; *Morris v Scribner*, *supra*, 69 NY2d 418 [1987]; *see also Serbian Eastern Orthodox Diocese for United States and Canada v Milivojevich*, 426 US 696 [1976]; *Kedroff v Saint Nicholas Cathedral of Russian Orthodox Church of North America*, 344 US 94 [1952]).