MINDAUGAS BLAUDZIUNAS et al., Appellants, v EDWARD CARDINAL EGAN et al., Respondents. [905 NYS2d 45]—

Order, Supreme Court, New York County (Louis B. York, J.), entered November 24, 2008, which denied plaintiffs' motion for a preliminary injunction seeking to enjoin defendants from

demolishing a church building and granted defendants' motion to dismiss the complaint, affirmed, without costs.

Within the hierarchical Roman Catholic Church, the decision to demolish the church building of the subject suppressed incorporated parish, duly made by the Archbishop and the trustees of the parish in accordance with applicable canon law and church bylaws, was ecclesiastical in nature. We adhere "to the long-standing and sensible prohibition against court involvement in the governance and administration of a hierarchical church" (*Committee to Save St. Brigid's Inc. v Egan*, 45 AD3d 375, 376 [2007]). Contrary to the arguments of the dissent and plaintiffs, Religious Corporations Law § 5 does not require that the demolition of the church be authorized by the parishioners. That statute and Religious Corporations Law § 91 vest approval authority for all actions taken by the trustees of an incorporated Roman Catholic church in the archbishop or bishop of the diocese to which that church belongs (*see Committee to Save St. Brigid's*, 45 AD3d at 376). The decision to demolish the church building of a suppressed incorporated parish, such as the one at issue here, is not a use of the corporation's property to further a religious, charitable, benevolent or educational object other than the support and maintenance of the corporation itself for which the authorization of "the members of the corporation at a meeting thereof" is required by Religious Corporations Law § 5, even assuming that the phrase "the members of the corporation" refers to the parishioners. Since Religious Corporations Law § 5 does not address the issue of the disposition of the property of a suppressed incorporated parish, and does not conflict with the decision-making authority vested in the archbishop and the trustees by applicable canon law and bylaws, we construe it to permit the demolition of a suppressed parish's church building without need for consultation with the former parishioners. Indeed, given that plaintiffs do not challenge the validity of the archbishop's suppression of the parish in question, it is undisputed that the parish's ecclesiastical existence has been extinguished (as the dissent recognizes). Accordingly, plaintiffs, as former members of a now defunct religious society, have no standing to bring this action. For the same reasons, the court properly dismissed the claim for breach of fiduciary duty.

We have considered plaintiffs' remaining contentions and find them unavailing. Concur—Friedman, J.P., Moskowitz and Renwick, JJ.

Catterson, J., dissents in a memorandum as follows: I must respectfully dissent. This is a dispute over the demolition of real property owned by a religious corporation. The plaintiffs in this

case make no intrusion into ecclesiastical matters such as challenging the suppression of the parish. Indeed, the suppression, in August 2006, of the ecclesiastical entity that was Our Lady of Vilna Parish means that the focus of our analysis is a property owned by, and in the custody and control of, a legal entity, a religious corporation. That corporation is bound by the laws of this state, specifically the Religious Corporations Law. The question arising on appeal is whether the members of that church are members of the corporation as that phrase is used in Religious Corporations Law § 5. In my view, this dispute concerns the statutory interpretation of a Religious Corporations Law provision pursuant to "neutral principles of law," and avoids the prohibition against court intrusion into ecclesiastical matters.

Indeed, the necessary corollary to the majority's holding is that any time a diocese suppresses a parish, regardless of the genesis of the parish or its corporate status under state law, its assets escheat to the bishop and/or the diocese. While the majority states baldly this is in accordance with canon law, it does not cite to any such authority, nor is there any authority in canon law, as demonstrated more fully below, for a diocese to plunder the assets of a parish.

The following facts are undisputed: Lithuanian immigrants built the Church of Our Lady of Vilna with their money "to have a place for worship and witness their love and faith in God" and established it to serve New York's Lithuanian community. The church was incorporated under the Religious Corporations Law in 1909 as the Church of Our Lady of Vilna. Between 1910 and 1912, the corporation obtained title in fee simple to the real property at 570 Broome Street in Manhattan on which the church building and the former rectory are located.

On August 1, 2006, Edward Cardinal Egan, head of the Archdiocese of New York (hereinafter referred to as archbishop) issued a decree of suppression of the parish of "Our Lady of Vilnius [sic]."[1] The decree stated that the parish was being suppressed because of a "serious decline in its parish population."

---

1. Although it is clear that the decree of suppression applied to the parish in question, the archbishop chose to use the modern designation of "Vilnius" rather than the actual name of the parish, namely, Vilna. The parish was apparently named for the Diocese of Vilna, established in Lithuania in 1387. "Vilnius" became the commonly used name for the capital city of Lithuania following the Soviet capture of the city from the retreating German Army in 1944. Thus, the archbishop's decree may have been correct in using the post-German occupation denomination of "Vilnius," it was nonetheless in error with regard to the name of the century-old parish.

More than five months later, on January 19, 2007, the archdiocese issued a press release making public its intention to close the parish of Our Lady of Vilnius because, inter alia, "Sunday Mass attendance . . . had decreased to approximately 100 parishioners[,] . . . the Mass was celebrated in English, not in Lithuanian . . . [and t]here were virtually no weddings or baptisms at the parish in recent years."

On or about February 26, 2007, the archbishop summoned Father Eugene Sawicki, the pastor of the parish to a meeting at the diocese office. While at the meeting, and without any prior notice to him, the lay trustees, or the parishioners, the archbishop sent his representatives and agents to padlock the church. Security guards were placed at the doors, and neither the parishioners nor Father Sawicki were permitted entry into the church. Within 24 hours, 500 parishioners signed and presented a petition at the diocese office asking the archbishop to reopen the church, but he refused to meet the petitioners and denied their request.

Subsequently, the defendants began to remove church property from the building including the sacramental records, the parish checkbook, a pulpit, two deacon's chairs and one celebrant's chair. The record further indicates that some of the frescoes above the altar were painted over in blue following the closure of the church. Others were peeled off the walls and ceiling, leaving bare cement. The apse was boarded over, the altar and pews were removed and stained glass windows and paintings were placed on the floor. Some paintings by Lithuanian artists were also allegedly removed.

On March 21, 2007, the archbishop dismissed Father Sawicki and appointed Monsignor Gilleece to replace him as rector on the board of trustees. As of that date, the three ex officio members of the board were the archbishop, Monsignor Brucato as the vicar-general of the diocese, and Monsignor Gilleece. On April 12, 2007, the church trustees appointed Claire and Thomas Libonati to be the lay trustees of the parish corporation.[2]

On April 30, 2007, the two former lay trustees of the church commenced an action (hereinafter referred to as *Our Lady of Vilna I*). The plaintiffs moved, inter alia, for a temporary restraining order and a preliminary injunction to stop the closing of the church and the removal of church artifacts.

2. Claire and Thomas Libonati replaced Joseph Pantuliano and Gertrude McAleer as trustees after their one-year terms had expired on March 31, 2007. Thomas Libonati resigned from the parish board of trustees in September 2007, and was replaced by Roseanne Nunziato in a special meeting held on October 22, 2007.

In a decision issued in May 2007, the court (Shirley Werner Kornreich, J.) denied the plaintiffs' motion, ruling that they had no standing as former trustees. (*Church of Our Lady of Vilna v Archbishopric of N.Y.*, 15 Misc 3d 1143[A], 2007 NY Slip Op 51125[U] [2007].) The court noted that the defendants had denied that there was any plan to sell or transfer the church building, and that they were transferring only the personalty inside for safekeeping. The court held that the board of trustees had authority under the corporation bylaws to dispose of the personalty, and that the archdiocese could proceed with its plans to shut down the church as a matter of ecclesiastical governance. By stipulation filed August 16, 2007, *Our Lady of Vilna I* was discontinued with prejudice.

Approximately two months later, at a meeting held on October 22, 2007, the board of trustees voted to demolish the church. The record further reflects that a letter dated January 17, 2008 was sent to neighbors of the church by a demolition contractor stating that the church building would be demolished "in the near future." On February 4, 2008, Monsignor Gilleece applied for a New York City Department of Buildings permit for the demolition. It is undisputed that there was no meeting of the parishioners to consider this decision.

On February 7, 2008, the plaintiffs, as members of the church, commenced the instant action by bringing an order to show cause seeking a preliminary injunction preventing defendants from demolishing the church. They also filed a verified complaint alleging, inter alia, that the defendants had violated Religious Corporations Law § 5 in going forward with the demolition without the approval of the members of the church.

On November 24, 2008, the court denied the plaintiffs' motion for a preliminary injunction and dismissed their complaint in its entirety. The court held that, to the extent the plaintiffs challenged the defendants' right to dispose of temporal church property, the issue was resolved in *Our Lady of Vilna I* and it would not allow relitigation of the matter. With respect to the issue of demolition, the court found that the board of trustees had been properly appointed and so the decision to demolish the building was properly made. While acknowledging that the defendants' prohibition against court intervention in this dispute was overstated, the court nevertheless rejected the argument that the defendants had violated the Religious Corporations Law in voting for demolition without the approval of the plaintiffs as members of the corporation. The court found that the plaintiffs were not members of the corporation. For that conclusion, it purported to rely on this Court's determination in

*Committee to Save St. Brigid v Egan* (30 AD3d 356 [1st Dept 2006] [hereinafter referred to as *St. Brigid I*]). On January 13, 2009, this Court granted a preliminary injunction barring demolition pending a hearing and determination of this appeal.

On appeal, plaintiffs rely on Religious Corporations Law § 5 to argue that the court below erred in its denial of the preliminary injunction and the dismissal of the complaint. That section, in relevant part, states: "trustees of every religious corporation shall have the custody and control of all the temporalities and property, real and personal, belonging to the corporation and of the revenues therefrom, and shall administer the same in accordance with the discipline, rules and usages of the corporation and of the ecclesiastical governing body, if any, to which the corporation is subject, and with the provisions of law relating thereto, *for the support and maintenance of the corporation, or, providing the members of the corporation at a meeting thereof shall so authorize*, of some religious, charitable, benevolent or educational object . . . and [the trustees] shall not use such property or revenues for any other purpose or divert the same from such uses" (emphasis added).

The plaintiffs claim that the defendants have violated this section specifically because the closing of the church means the property is no longer being administered for the support and maintenance of the corporation, the primary purpose of which is to "enable its members to meet for divine worship." (Religious Corporations Law § 2.) The plaintiffs further claim that pursuant to the provision, their authorization is needed for any other purpose such as the demolition of the church. (*See* Religious Corporations Law § 5.) The plaintiffs assert that under the plain meaning of Religious Corporations Law provisions and the church bylaws, the members of the parish and the corporation are the same. Moreover, the plaintiffs, citing *Morris v Scribner* (69 NY2d 418 [1987]), contend that allowing the defendants to proceed with the demolition without meeting with church members would undermine the very purpose for which the Religious Corporations Law was enacted, namely, to prevent the diversion of property from its true beneficiaries, the members of the congregation.

The defendants, on the other hand, assert that Religious Corporations Law § 5 is a general provision and that its reference to a meeting of the "members of the corporation" pertains to those denominations which are congregational and which permit votes by the parishioners, and not to the Roman Catholic Church which is hierarchal in nature. In any event, the defendants assert that Religious Corporations Law §§ 91 and 92

recognize a Roman Catholic archbishop's authority and supremacy in the right to dispose of a church corporation's property, including real property.

The defendants focus on the wording that emphasizes the administration of property in accordance with the "discipline, rules and usages . . . of the ecclesiastical governing body" (Religious Corporations Law § 5), that is the Roman Catholic Church. They argue that the provision incorporates by reference the canons of Roman Catholic Canon Law; that Canon Law puts all control and custody of goods and property in the hands of the hierarchy, specifically the archbishop as head of the diocese, and therefore the archbishop does not need authority or approval from anyone for the demolition of the church. Moreover, they argue that the court below correctly relied on this Court's decision in *St. Brigid I* to conclude that the parishioners are not members of the corporation and that the only members of the corporation are the trustees. I disagree.

As a threshold matter, it should be noted that this Court did not consider the issue, nor did it reach the merits, of whether members of the church are members of the religious corporation either in *St. Brigid I* or *Committee to Save St. Brigid's Inc. v Egan* (45 AD3d 375 [1st Dept 2007] [hereinafter referred to as *St. Brigid II*], *lv granted* 10 NY3d 756 [2008], *appeal withdrawn* 11 NY3d 921 [2009]). In the first action, parishioners asked the court to direct the diocese to renovate and reopen St. Brigid's Church.[3] This Court held that "the relief sought by plaintiffs, i.e., an order mandating that the funds in question be used to restore the subject property *for use as a church*, would impermissibly involve the court in the governance and administration of a hierarchical church." (30 AD3d at 356 [emphasis added].) This Court viewed *St. Brigid II*, as deriving from "the same circumstances as those dismissed in the first action" and thus continued to adhere to the "prohibition against court involvement in the governance and administration of a hierarchical church." (45 AD3d at 376.)[4]

Specifically, we rejected the argument that the facts before it

**3.** St. Brigid's, a church built by Irish immigrants in 1848, fell into disrepair. Parishioners raised more than $100,000 for renovations, but the archbishop decided to close it in 2004.

**4.** The defendants in this case decried the granting of leave based on the sole judge dissent of Justice Kavanagh in *St. Brigid II* which the court below described as an "impassioned and thorough" dissent but which the defendants incomprehensibly characterized as "illogical, inconsistent and often incoherent." In any event, the appeal was subsequently withdrawn as moot after an anonymous donor came forward with $20 million for renovation of the church, and the archbishop reversed the decision to close it. Additionally,

in either action warranted an analysis of Religious Corporations Law § 5. In my opinion, the facts of the instant case are distinguishable. First, the archbishop issued a formal canonical decree of suppression of the parish of "Our Lady of Vilnius [*sic*]." Second, the plaintiffs do not dispute the archbishop's authority to do so, nor his authority to close the church for religious services. Hence, the ecclesiastical entity of the church of Our Lady of Vilna has been extinguished and no longer exists. Only the legal entity, the corporation that owns the church building and the real property on which it is located, remains. Since the board of trustees voted for demolition as a corporate matter without regard to the Religious Corporations Law requirement of meeting with the members of the corporation, this became solely a property dispute between the plaintiffs and diocese. As such, it may be adjudicated by this Court.

Indeed, the Court of Appeals reiterated the permissibility of judicial intervention in church property disputes as recently as October 2008. (*Episcopal Diocese of Rochester v Harnish*, 11 NY3d 340 [2008].) In so doing, the Court relied on the seminal First Amendment decision of the United States Supreme Court in *Jones v Wolf* (443 US 595 [1979]).

In *Jones*, the United States Supreme Court held that the First Amendment "prohibits civil courts from resolving church property disputes on the basis of religious doctrine and practice." (*Jones v Wolf*, 443 US at 602; *see also Serbian Eastern Orthodox Diocese for United States & Canada v Milivojevich*, 426 US 696 [1976].) However, the Court acknowledged that states have a legitimate interest in providing a civil forum for the resolution of disputes over ownership of church property and can do so "so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith." (443 US at 602 [internal quotation marks and citation omitted].) The Court then provided a road map for determining property issues according to a "neutral-principles approach" which is the approach the Court of Appeals used in *Episcopal Diocese of Rochester* (11 NY3d at 350-351).

In *Episcopal Diocese of Rochester*, such application of neutral principles of law required the Court to focus "on the language of the deeds, the terms of the local church charter, the State statutes governing the holding of church property, and the provisions in the constitution of the general church concerning the ownership and control of church property." (*Id.* at 350.) In this

---

it could, of course, be posited that a decision based on religious doctrine and "tenets of faith" could not be reversed by a mere infusion of cash, no matter how large.

case, therefore, this Court is obliged to focus on the language of the deeds, and the relevant provisions of the Religious Corporations Law as they appertain to the holding of church property. This necessarily includes the provisions that appertain exclusively to the Roman Catholic Church, the bylaws of Our Lady of Vilna Church and the relevant canons in the Roman Catholic Church's Code of Canon Law (the governing rules and laws of the Church), "scrutiniz[ing] [them] in purely secular terms" as the Court scrutinized the Dennis Canons in *Episcopal Diocese of Rochester* (11 NY3d at 351).

Based on the certificate of incorporation, it is uncontroverted that Our Lady of Vilna Church was incorporated in 1909 pursuant to the Religious Corporations Law of 1895. The certificate states that the then-archbishop of the diocese, the vicar general, the rector and "two laymen members of said church" are "desirous of incorporating said Church, or the congregation thereof" and "we do hereby certify that the name or title by which we and our successors shall be known as a body corporate by said law is Church of Our Lady of Vilna."

There is also no dispute that the corporation owns the real estate, that is the real property of the church and rectory at Dominick Street. In 1910, the corporation executed a deed to the real estate on which the church and the rectory were subsequently built. The deed conveyed title to the real property in fee simple to the Church of Our Lady of Vilna, "a religious corporation." In 1912, a second deed conveyed adjoining property to the corporation. Neither deed includes any provision for reversion to the diocese.

It is further undisputed that the Religious Corporations Law provides for the trustees of each religious corporation to administer the temporalities and property, real and personal of an incorporated church save that the trustees of a Roman Catholic church cannot transfer any property without the consent of the archbishop or bishop of the diocese. (Religious Corporations Law § 5.) Certain sections of the Religious Corporations Law appertain solely to the Roman Catholic Church. Specifically, section 91 applies to the governance of religious corporations affiliated with the Church. The defendants correctly assert that pursuant to the plain meaning of Religious Corporations Law § 91 the five trustees for each incorporated Roman Catholic church are not chosen by the parishioners, and the parishioners are not entitled to participate in the appointment or determination of the composition of the board of trustees. Section 91 further provides that the board will be comprised of the archbishop and vicar general of the diocese, as well as the rector of the church,

and their successors in office are automatically trustees by virtue of their offices; and that these ex officio trustees will select two laypersons from the church to serve as the appointive trustees.

Further, the bylaws of the corporation adopted by the trustees of Our Lady of Vilna in 1980 reinforce the hierarchical nature of the church by stating that the archbishop or bishop of the diocese is by virtue of the office the president and the chief executive officer of the corporation, the vicar general is vice-president and the rector is secretary-treasurer of the corporation; that these three trustees, or a majority of them, will appoint the two lay trustees. The bylaws provide that the trustees administer the temporalities and property of the corporation in accordance with "the discipline, rules and usages" of the Roman Catholic Church and of the archdiocese "for the support and maintenance of the Church and of its various religious, charitable, benevolent and educational activities." Further, the bylaws indicate that the duties of the trustees are severely limited, and the consent of the archbishop is required for, inter alia, the following: mortgaging, leasing, selling any of the corporation's real property; for acquiring any real property by lease, purchase, gift or devise; for accepting by gift or bequest any money or personal property and for any expense in making repairs to the property or purchasing equipment for the church. They fully mirror the provision in Religious Corporations Law § 91 that states: "[n]o act or proceeding of the trustees . . . shall be valid without the sanction of the archbishop or bishop of the diocese."

All of the foregoing is uncontroverted but it does not end the inquiry. The provision that any act or proceeding undertaken by the trustees of the corporation requires the consent of the bishop is not exclusive. It does not mean that every act or proceeding needs *only* the consent of the bishop—especially when the primary purpose of the corporation as defined by the Religious Corporations Law (enabling members to attend religious services) is no longer viable. In my opinion, the defendants have failed to show that the provision mandating a meeting and authorization by the members of the corporation when the property is to be administered by the trustees for a purpose other than the support and maintenance of the corporation does not apply to the Roman Catholic Church. Indeed, the first sentence of Religious Corporations Law § 5 unequivocally states that the section applies to the trustees of "every" religious corporation. Specifically, in my view, the defendants have failed to show that the plaintiffs in the instant case are

not the type of "members of the corporation" to which section 5 applies.

First, I disagree with the defendants' contention that, because pursuant to Religious Corporations Law § 2-b (2) a religious corporation is a type B corporation under the Not-For-Profit Corporation Law and may have no members, the subject religious corporation has no members. Under N-PCL 601 (a), a corporation "shall have one or more classes of members, or, in the case of a Type B corporation, may have no members, in which case any such provision for *classes of members or for no members* shall be set forth in the certificate of incorporation or the by-laws" (emphasis added). In this case, neither the certificate of incorporation nor the bylaws of Our Lady of Vilna set forth either eventuality. Neither document states unequivocally that the corporation has no members, and since they do not provide for different classes of members, by default the corporation has members—all of one class.

Second, the plain meaning of provisions in the Religious Corporations Law and the church's bylaws indicate that the terms members of the church and members of the corporation are interchangeable. According to Religious Corporations Law § 2, "[a]n 'incorporated church' is a religious corporation created to enable its members to meet for divine worship or other religious observances." The bylaws do not mandate a different conclusion. Article II of the bylaws contains the definitions of terms used in the document as follows: "4. 'Church' shall mean the ecclesiastical entity (parish) that was incorporated under civil law as this Corporation"; "6. 'Members of the Church' shall mean the parishioners of the aforesaid ecclesiastical entity (parish)." Hence, members of the church are members of the ecclesiastical entity as corporation.

While the parishioners of a hierarchical Roman Catholic church may not have voting rights per se or membership certificates, Religious Corporations Law § 5's requirement that member authorization must be obtained to use church property for "other" religious or charitable purposes imposes no requirement that such members be "voting" members. Indeed, where a vote of qualified voting members is required, Religious Corporations Law § 5 so provides. (*See e.g.* Religious Corporations Law § 5 [stating that the adoption or amendment of bylaws requires a two-thirds vote of the "qualified voters"].)

Third, the defendants' argument is that if the Religious Corporations Law § 5 provision is read "with an understanding of the unique and inviolate precepts of the particular religious society" then it is evident that the provision requiring "authori-

zation by members of the corporation" cannot apply to the Roman Catholic Church. In my opinion, that argument is without merit as the defendants acknowledge that, "[a]lthough the Legislature has revised [Religious Corporations Law] § 5 numerous times over the last 200 plus years in attempting to make it applicable to other faiths and forms of religious societies, the language regarding 'members' was never expunged." Clearly, the Legislature intended, and still intends the provision to apply to *every* church that seeks the advantages of incorporation under the Religious Corporations Law.

Lastly, contrary to the defendants' assertions, the admittedly sparse case law that exists appertaining to incorporated Roman Catholic churches is not outmoded but is still good law. Moreover, it indicates that the parishioners of Roman Catholic churches that incorporate have some, albeit restricted, role in the religious corporation. Notably, *Baxter v McDonnell* (155 NY 83 [1898]) involved the Roman Catholic bishop of an *unincorporated* church in 1898 where the title to the church real estate was held by the bishop in his own name. The court found that, "[t]he purpose of this arrangement is to exclude the laity from that *power of interference which they would have were the title vested in a corporation*" (*id.* at 94 [emphasis added]).

Indeed, 35 years prior to that case, the 1863 amendment to the Religious Corporations Law revised the statute specifically with regard to the incorporation of Roman Catholic churches. With regard to that amendment, the Court of Appeals held in 1888 that while the amendment changed the mode of selection of trustees and had vested in them power of management and control it "does not constitute the trustees [as] the corporation in place of the congregation." (*People's Bank v St. Anthony's R.C. Church*, 109 NY 512, 521 [1888].)

Ultimately, I disagree with the defendants' characterization of New York common law and statutory law as supporting the view that the disposition of church property and funds "are matters solely and exclusively within the Archdiocese's ecclesiastical and hierarchical authority." This may be true to a large extent but it overstates the case. So far as statutory law is concerned, the defendants point to Religious Corporations Law § 92 as the provision that gives the archbishop the power to distribute funds from a sale of property, at his discretion. Religious Corporations Law § 92, however, deals with a Roman Catholic parish that has been "duly divided" and where "the original . . . church corporation is given one part of the old parish, and a new or second . . . church corporation is given the remaining part of the old parish." This provision essentially speaks to a

merger of parishes in the same diocese. That is not this case. No part of the old parish remains as an ecclesiastical entity. The parish was not merged or realigned. It was simply closed and extinguished, and such Lithuanian parishioners as were acknowledged to be remaining by the archdiocese were directed to services in two other dioceses, of Brooklyn and Newark.

Moreover, the power of the archbishop to dispose of church property is further circumscribed, as the defendants acknowledge, by Religious Corporations Law § 12, which provides that a religious corporation must obtain leave of a court before selling or mortgaging any of its real property. While Religious Corporations Law § 12 (3) acknowledges that the trustees of a Roman Catholic church cannot do so without the consent of the archbishop, nevertheless once that consent is given, the transaction is still subject to judicial review. Thus, as stated above, the fact that any act or proceeding by the trustees requires the archbishop's consent does not mean that only his consent is required for such act or proceeding.

In my opinion, the most troubling facet of the defendants' argument is their assertion that the Religious Corporations Law, by incorporating canon law, recognizes that the archbishop of a diocese has the sole, exclusive ultimate authority over the disposition of properties belonging to the individual parishes. In placing such weighty reliance on canon law the defendants ensure that this dispute cannot be resolved without this Court following the guidelines of the Court of Appeals in this area, and looking at the relevant canons within a secular context. (*See Episcopal Diocese of Rochester*, 11 NY3d at 349.) In my view, we need not resolve the merits of this dispute by analyzing the canons; thus the following serves only the purpose of illuminating the inconsistencies in the defendants' argument.

First, it should be noted that, in general, the Roman Catholic Church in the United States has been less than consistent in the use of its canons. Depending on what interpretation inures to its benefit, ownership, and therefore custody and control of real property, either belongs to the parishes or to the diocese. (*See* Jonathan C. Lipson, *When Churches Fail: The Diocesan Debtors Dilemma*, 79 S Cal L Rev 363, 385 [2006] [the dioceses in current bankruptcy cases arising out of damages claimed by victims of sexual abuse "have all argued that parish property is not diocesan property and should therefore not be part of the bankruptcy estates"].)[5]

Most notably in Spokane, Washington, the diocese invoked

---

5. In those dioceses of Spokane, Portland, and Tuscon, the bishop holds legal title to parish properties in a corporate form known as "corporations

Canon 1256 which provides that "the ownership of goods belongs to that juridic person which has acquired them legitimately."[6] Hence, the diocese argued that it had no interest in the property since a parish and a diocese are legally distinct juridic persons. (*Id.* at 385-386, citing *In re Catholic Bishop of Spokane*, 329 BR 304, 318-320 [Bankr ED Wash 2005].) The court found the argument prohibited by res judicata since approximately eight years earlier, the diocese had argued it owned the parish property that it sought to demolish. (*In re Catholic Bishop of Spokane* at 319, citing *Munns v Martin*, 131 Wash 2d 192, 930 P2d 318 [1997].)

In the instant case, the penchant for picking and choosing canons is also evident. The defendants cite Canon 515 (2) which states that a bishop has exclusive control over altering and suppressing parishes, and with which the plaintiffs do not argue; they also cite Canon 1254 which states that "the Catholic Church by innate right is able to acquire, retain, administer, and alienate temporal goods independently from civil power." However, there is no reference to Canon 1256 which, as detailed above, deals with ownership of goods accruing to those entities that legitimately acquire them such as the religious corporation of the Church of Our Lady of Vilna. Nor is there any reference to Canon 1267 which states that "[o]fferings given by the faithful for a specified purpose may be used only for that purpose." (*See* Nicholas P. Cafardi, *The Availability of Parish Assets for Diocesan Debts: A Canonical Analysis*, 29 Seton Hall Legis J 361, 371 [2005].)

Most significantly, the defendants do not cite to, or explain, Canon 123 although it, along with Canon 515 (2), is referenced in the archbishop's decree of suppression of the parish of "Our Lady of Vilnius." Specifically, in the decree of suppression, the archbishop stated, in relevant part: "[a]fter serious consideration of the intention or will of donors and benefactors . . . in accord with Canon 123, allocation of the goods and obligations of this parish will first provide for necessary pastoral care of its former parishioners and then, whatever remains, will belong to the Archdiocese of New York."

First, scrutinizing the canon in purely secular terms, this

---

sole." In those dioceses, the hierarchy has argued in these cases that corporations sole hold the legal title but only in trust for the parishes. (Jonathan C. Lipson, *When Churches Fail: The Diocesan Debtors Dilemma*, 79 S Cal L Rev 363, 385 [2006].)

**6.** Parishes and diocese are public juridic persons according to canon law. (*See* John P. Beal, New Commentary on the Code of Canon Law 171 [Paulist Press 2000].)

conflicts with the defendants' assertion on appeal that "the [r]ecord is devoid of any evidence that the church property was, or is, to be diverted away from the church corporation and to any other uses." Clearly, the archbishop's intention is to divert some of the property to the archdiocese. Second, it appears that this particular canon dovetails somewhat with the requirement of Religious Corporations Law § 5 that authorization is required when the property is administered for purposes other than the support and maintenance of the corporation.

Canon 123 states in pertinent part that when a parish is extinguished "the allocation of its goods . . . go[es] to the juridic person immediately superior,[7] always *without prejudice to the intention of the founders and donors*" (emphasis added). Indeed, as the editors of the New Commentary on the Code of Canon Law point out: "While in many cases such a disposition [to an immediately superior juridic person] would be unobjectionable . . . As in canons 121 and 122,[8] and frequently throughout the code, so also in canon 123 the Church's commitment to faithful fulfillment of the intentions of founders and donors finds expression." (John P. Beal, New Commentary on the Code of Canon Law 172.)

The idea that an archdiocese or diocese cannot simply alienate the property of a parish where property has been accrued through the efforts of parishioners is explained succinctly in the law review article by author Cafardi, in which he writes: "Parishes are not plums for the diocesan bishop to pick." (Nicholas P. Cafardi, *The Availability of Parish Assets for Diocesan Debts*, 29 Seton Hall Legis J 361, 368 [2005].) "The assets of a parish were contributed by the parishioners to serve that parish community, and not to serve the diocese. There were fund drives to build the parish church. There were fund drives to build the parish school, the rectory . . . Gifts to the parish were solicited so that the parish community had the means available to them to work out their salvation. And when a bishop tells those people that he is closing Parish X and they need to work out their salvation at Parish Y, then those means need to follow them to Parish Y." (*Id.* at 372.)

The defendants appear to tacitly acknowledge the idea that former parishioners have some property right in the goods of the former parish by stating that, "the [r]ecord demonstrates

---

**7.** According to canon law, a diocese would be a superior juridic person to a parish in that diocese. (*See* John P. Beal, New Commentary on the Code of Canon Law 171).

**8.** These two canons deal with the division and consolidation of juridic persons. (*See id.*)

that [d]efendants . . . took pains to carefully preserve the ecclesiastical and sacred items and even transferred certain goods to nearby parishes to allow former parishioners convenient access to same." At the very least, a meeting at which the will and intentions of the donors in the former parish are enunciated to the archdiocese does not appear, in secular terms, to conflict with "the discipline, rules, and usages" (Religious Corporations Law § 5) of the Roman Catholic Church. Nor is it a challenge to the hierarchical nature of the Roman Catholic Church or intrusion on its internal governance and administration in derogation of canon law. For all the foregoing reasons, therefore, I would reverse the court's order, and grant the preliminary injunction. **[Prior Case History: 2008 NY Slip Op 33144(U).]**